# THE UNITED RAILWAYS & ELECTRIC COMPANY *vs.* AGNES A. CLOMAN.

*Negligence—Evidence—Declarations as res gestae—Right of Court to Order Physical Examination of Plaintiff in Action for Injuries—Rearend Collision with Wagon on Street Railway Track—Legal Sufficiency of Evidence—Burden of Proof—Failure to Call Witness —Instructions to Jury.*

Plaintiff was driving at night in a wagon on the track of an electric street railway when the wagon was violently struck from behind and plaintiff thrown out and injured. In an action against the railway company, the defendant did not admit that the wagon had been struck by one of its cars. The horse and some of the articles in the wagon were delivered a day or two afterwards to the plaintiff's husband by an agent of the defendant. *Held*, that the receipts then given to the defendant for the horse and articles, (produced by the defendant after notice) which stated that the articles had been taken charge of "after a collision with 931 car," are admissible in evidence as tending to show that there

had been a collision between a car of the defendant company and the
wagon.

A man dressed in the uniform of the defendant street railway company·
with a conductor's badge on his cap, rushed hurriedly and in an excited
condition into a saloon at night, and asked if a telephone was there,
saying, "we have struck a wagon down here " Some of the men in
the saloon ran to the place of the accident, getting there in less than a
minute, and found a car standing still without a conductor, and the
damaged wagon and some of its contents strewn over the tracks.
*Held*, that the statements made by this person in the saloon are admis-
sible in evidence as part of the *res gestae*, although there was no direct
evidence that he was in fact a conductor of the defendant company.

The trial Court has the power to compel the plaintiff in an action for per-
sonal injuries, to submit his person to an examination by physicians.

Such personal examination of the plaintiff cannot be demanded by the
defendant as a matter of right, but an application for it is addressed to
the sound discretion of the trial Court, which will not be interfered with
by the appellate Court unless such discretion was manifestly abused.

Unless the plaintiff consents to have the examination made by the de-
fendant's physician, the safe course is for the trial Court to name some
disinterested physician to make such examination.

Plaintiff's evidence showed that she was driving home from market with
her husband between eleven and twelve o'clock at night in a wagon
with closed curtains; that the street on which they were driving was un-
lighted and unpaved, outside of the street railway tracks, on which it was
necessary and customary for travellers to drive; that they were on the
righthand track and heard no signal or noise before the wagon received
a violent blow from behind and plaintiff and her husband were thrown
out and rendered unconscious. Just after the accident, a conductor of
the railway company, said to a person in a nearby saloon that they had
run into a wagon. The contents of the wagon and also the horse were
taken into the possession of the company and by it afterwards delivered
to plaintiff's husband. In an action against the railway company it
offered no evidence and made no explanation as to the occurrence of the
accident. *Held*, that the evidence that the injury was caused by the
defendant's negligence is legally sufficent to go the jury.

*Held,* further, that the evidence of contributory negligence on the part of
the plaintiff is not sufficient in law to bar her recovery, and that even if
there had been negligence on her part, or that of her husband, the de-
fendant would not be released from liability if its motorman saw, or by
the exercise of due care could have seen, the wagon in time to have
stopped the car.

In an action for injury caused by the defendant's negligence, when the
declaration contains many allegations as to the injuries suffered by the
plaintiff, a prayer offered by the defendant is erroneous which instructs

the jury that the burden of establishing by a preponderance of proof the state of facts alleged in the declaration rested upon the plaintiff, and if the testimony in this case should be such as to leave the minds of the jury in a state of even balance as to the truth of the allegations in the declaration, the verdict must be for the defendant.

Plaintiff's physician, who attended her after the infliction of the injuries for which this action was brought, testified at the trial, but another physician who also saw the plaintiff was not called as a witness, although summoned. *Held*, that the defendant is not entitled to have the jury instructed that they may infer from such failure to produce the other physician, that his testimony would be unfavorable to the plaintiff.

When a defendant railway company, in an action charging it with negligence, fails to produce any testimony in defense, although the case as made by the plaintiff was sufficient to go to the jury on the question of negligence, and certain facts required explanation which the defendant could have made, a prayer offered by it is properly rejected which instructs the jury that no just criticism can be applied to the defendant because it failed to call any witness in its own behalf.

*Decided April 1st, 1908.*

Appeal from the Court of Common Pleas (HARLAN, C. J.), where there was a judgment on verdict for the plaintiff for $5,000.

*Defendant's 17th Prayer.*—That from the failure of the plaintiff to produce as a witness Dr. R. H. Follis, the jury may infer that his testimony would be unfavorable to the plaintiff. *(Refused.)*

*Defendant's 18th Prayer.*—That the failure of the plaintiff to produce as a witness Dr. R. H. Follis, is a matter which the jury may take into consideration in determining the nature and extent of the alleged injuries of the plaintiff. *(Refused.)*

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and WORTHINGTON, JJ.

*J. Pembroke Thom* and *Lee S. Meyer*, for the appellant.

*R. R. Boarman* and *James J. Lindsay*, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment against the appellant in favor of the appellee for injuries alleged to have been sustained by the latter, by reason of a car of the railway company being driven against the wagon in which she was riding on Federal street, in the city of Baltimore. There are twelve bills of exception in the record which will for the most part be considered in the order they are presented in the brief of the appellant.

1. The first and second exceptions were taken to the rulings of the lower Court in admitting two receipts which were given to the company by the plaintiff's husband, through his son Frank Cloman. Mr. and Mrs. Cloman, who live in Baltimore County, had been to market in the city on Saturday, October 20th, 1906. They started home going out Federal street, in a one horse wagon about eleven o'clock at night. While driving easterly on the track of the appellant they were run into from the rear and both were violently thrown out of the wagon and injured. The theory of the plaintiff is that they were struck by a car of the defendant, but the latter did not admit that the injury was so occasioned. The plaintiff and her husband were unable to testify, of their own knowledge, what had caused the injury, as they were rendered unconscious. They had a chicken coop in the wagon, which they used as a seat, and also a number of articles when the accident occurred. On Monday, October 22nd, Frank Cloman went to one of the barns of the defendant and received his father's horse through Mr. DeMoss, who was admitted to be a "special agent" of the defendant, and who directed the party in charge of the horse to deliver it to Frank. Mr. DeMoss also went with him to another barn of the defendant and ordered the employees there to deliver to him the chicken coop and some other articles which were in the wagon. The plaintiff gave the defendant notice to produce, at the trial, the receipts given for the horse and goods, respectively, which Frank Cloman had signed when he received them. The defendant produced them, and Frank testified they were written

by Mr. DeMoss and signed by him, but the defendant objected to the admissibility of them in evidence. One of them reads, "Baltimore, October 22nd, 1906. Received of the United Railways and Electric Company of Baltimore, 1 bay horse, 1 horse blanket, 1 set of single harness with both breeching straps broken. Taken charge of after a collision with 931 car, Federal street line, Oct. 20, 1906. (Signed) James F. Cloman, by J. F. Cloman, Jr.," and the other described the other articles, and concluded, "Taken charge of Oct. 20, 1906, in collision with 931 car, Federal street line."

We see no reason why those receipts were not admissible. They were unquestionably *some* evidence tending to show the theory of the plaintiff, that there had been a collision between one of the cars of the defendant and the wagon, inasmuch as it was shown by them that the horse and contents of the wagon were taken possession of by the defendant. Unless there had been such collision, there is no possible reason suggested for the defendant taking possession of the property. Those in charge of the barns surrendered them on the order of Mr. DeMoss and, although his powers as "special agent" are not stated, he prepared the receipts for Frank Cloman to sign and the defendant had them in its possession. The receipts were at least admissible to corroborate the witness, that he had received the horse and goods from the custody of the defendant, and when it was shown that DeMoss wrote them and they were still in the possession of the defendant his authority to take them could be implied. If there was any question about the effect of the parts of them that refer to the collision with car 931, that ought to have been raised in some way other than by a general objection to them.

But inasmuch as DeMoss had such control of the horse and other property as to direct the surrender of them to Cloman, and he had written the receipts which were in the possession of the defendant, at the time of the trial, there could be no valid reason for excluding the statements in them which explained how the defendant came into the possession of the property. There is not only no suggestion that any one rep-

resenting the defendant had at any time before the trial objected to the statements in them, as to how the defendant came into possession of the property, but they were kept in the possession of the defendant and its "special agent" had written them.    If Mr. Cloman, Sr., had sued the defendant to recover the property, the receipts would have been binding on him, and, under the circumstances stated, we can see no reason why they should not be on the defendant.  They would not have furnished the defendant a complete record without some reference to how the property came into its possession, and there was ample evidence to establish, *prima facie*, that DeMoss had authority to do what he did in connection with them.

2. The defendant made nine motions to strike out testimony, which had been admitted subject to exception—two of which were afterwards withdrawn, and the others were overruled. The accident occurred on Federal street, east of Lakewood avenue.    That part of Federal street is not thickly settled, and as the street itself is not paved the car tracks are used by people driving along it.    The nearest public house to the place of accident was Lumsen's saloon and dwelling, which is on the corner of Milton avenue and Federal street—fronting on the former with a side entrance from Federal street.  Milton avenue is two blocks from Lakewood avenue, and the place of accident was described as being about two blocks and a half from Lumsen's place although, as we understand the evidence, no street acutually crosses Federal street between those two points—Lakewood avenue stopping at Federal and the grade of Luzerne street not having been adjusted to that of Federal, which had been lowered.   Between 11 and 12 o'clock the night of the accident, some one dressed in the uniform of the defendant company, with a conductor's badge on his cap, rushed into the saloon of Lumsen and inquired whether there was a Maryland telephone there.   He was asked what the trouble was and replied, "we struck a wagon," "we have smashed into a wagon down here on Federal street," "we run into a wagon on Federal street," or "had run into a wagon down on Fed-

eral street near Lakewood avenue," as stated by the respective
witnesses.    Several of the men in the saloon started imme-
diately to the place of the accident.    Two of them ran—
taking, according to the statement of one of them, about half a
minute to get there.    When they arrived, they found a car
standing on the east-bound track and the wagon on the side of
the west-bound track.    The rear right wheel was broken to
pieces, some spokes were broken out of the rear left wheel
and the wagon was otherwise badly injured.    Some of the
contents of the wagon were scattered over and about the
tracks.    The motorman was at the car, but there was no con-
ductor there when the witnesses arrived.    Mr. and Mrs.
Cloman were at that time in the car, and at the suggestion of
one of the witnesses the motorman ran it to the eastern term-
inus of those tracks, crossed over to the west-bound track and
brought them back to Lumsen's place, where they were taken
out of the car and remained until late in the night, when they
were carried to a relative's house.    The conductor was told
when he went into Lumsen's where he could get a Maryland
telephone, left Lumsen's as soon as he had told of the acci-
dent and was not seen again by the witnesses until the car
had been run back there, where one of them saw him.    When
the conductor first went into the saloon, he was, as described
by Lumsen, "just as white as he could be, and almost fright-
ened to death; he was quite a young youth," and all of the
witnesses spoke of him being in a very excited condition.

There would seem to be no difficulty about treating the
statements of the conductor as part of the *res gestae*, if he
was the conductor in charge of the car in question.    Very
little time was required for him to go from the place of the
accident to Lumsen's, and he was in such an excited condi-
tion as to justify the belief that he had hurriedly come from
it.    He said that, as he left, the motorman was taking the
parties out from under the wagon.    The witnesses reached
the place of accident in a very short time and they found the
car still there, in charge of the motorman, and that the wagon
had been violently struck by something.    No one can doubt

from the evidence that it had been struck in the rear by a car running on the track of the defendant.   Mr. Cloman testified that he was driving easterly, on the eastbound track, and without warning his wagon was struck in the rear.   A car of the defendant was found standing there and some of the contents of the wagon were strewn over the tracks, just as would be expected from such a collision.   It would be a reflection upon the wisdom of the law to hold that there was not enough in this record to make out a *prima facie* case of the wagon having been struck by the car of the defendant, for it seems to us that no other conclusion could be reached under all the circumstances—even if the statements of the conductor be entirely ignored.   There is not a particle of evidence to show that there was anything which could have produced the injury excepting a car, and as a car was found standing at the place of the accident, at a time which must have been shortly after it occurred, it is impossible to account for it in any other way from what the record discloses.   There was no suggestion by the motorman that he was under no obligation, or had no authority, to carry the injured parties to the end of the line, and then bring them back to some place where they could be treated for their injuries but he did precisely what would have been expected of him and what he ought to have done if his car ran into the wagon.   When therefore all the surrounding facts are considered—and especially when we find that the company took charge of the horse and contents of the wagon, describing them in the receipts as above mentioned, no possible injury could have been done the defendant by admitting the statements of the conductor, even if they were conceded to have been inadmissible, for no jury of ordinary intelligence could have had any doubt that the accident was caused by the collision of a car of the defendant with the wagon.

But we do not deem it necessary to merely rely on the fact that there was no reversible error, because there was no injury, for we are of the opinion that the evidence was admissible. The person spoken of as the conductor wore the uniform and

the badge of a conductor of the defendant.    His excited con-
dition and haste in going into Lumsen's place were some evi-
dence of his having just come from the place of the accident,
which he spoke of.    No conductor was on the car when the
witnesses reached it, not over a minute or so after he left
Lumsen's presumably to get a Maryland telephone—and the
same man was seen at Lumsen's again after the car got back
there but there was no conductor on the car in the meantime.
His statement that there had been an accident at the place in-
dicated by him was corroborated, and it is impossible to be-
lieve that he was not the conductor on that car, in the ab-
sence of some proof to the contrary.    Such evidence was not
conclusive against the defendant, but the facts proven and the
surrounding circumstances were sufficient to establish, *prima
facie*, that the man who went into Lumsen's place was the
conductor of the car found standing at the place of the acci-
dent, and they were sufficient to call upon the defendant to
explain them.    None of the witnesses knew him, but the de-
fendant knew who was conductor on that particular car and
could have shown what became of him, if he was not the per-
son who went into Lumsen's.    The cases of *Balto. City* v.
*Lobe*, 90 Md. 310; *Wright* v. *State*, 88 Md. 705, and others
relied on by the defendant are not at all in conflict with what
we have said, but support the position we have taken.    Of
course, as was said in *Wright* v. *State*, "The act or dec-
laration sought to be proven must, however, be so connected
with the transaction as to be part of it,"or as stated in *Lobe's
case*, "to make the declaration a part of the *res gestae* it must
be so connected with the transaction as to be reasonably a
part of it; it must not be the result of premeditation or de-
sign, but the 'immediate spur' of the transaction," but in this
case the evidence shows not only that the statements of the
conductor were so connected with the transaction as to be
part of it, but he was apparently seeking to inform his com-
pany that the accident had happened, and doubtless would
have sought directions as to the course he was to pursue, if
he had found a Maryland telephone there.    We are of

opinion that the evidence included in these motions was admissible.

3. The defendant moved the Court to direct the plaintiff to permit the doctors of the defendant to make a physical examination of her, and also made another motion asking the Court to direct her to submit to such examination by a doctor to be appointed by the Court, but both motions were overruled. The authorities are conflicting on the subject. It is said that there is no record in the English reports of such an order, or even of such a motion. In the Federal Courts it is held that the Court has no power to compel a plaintiff in an action for personal injuries to submit his person to a physical examination, and it was so decided in *Union Pac. Co.* v. *Botsford*, 141 U. S. 250. The weight of authority seems to be to the contrary, in the State Courts of this country, although, while the power is admitted many cautions and limitations are suggested, and the general rule is that it cannot be demanded as a matter of right by a defendant, but the application is addressed to a sound discretion of the trial Court, which will not be interfered with by an appellate Court unless such discretion was manifestly abused. That seems to us to be the correct view. We cannot admit that the trial Court has no such power in any case, for sometimes it may be apparent that a plaintiff is feigning, and has not suffered such injuries as he pretends he has sustained. Instances are not unknown to Courts and counsel, who have had experience in such cases, in which jurors have been imposed on, and sometimes even reputable physicians, who have been called upon to testify on behalf of plaintiffs, have been deceived. When therefore the ends of justice seem to require it, there can be no valid reason why an examination should not be permitted, if seasonable application is made, and the Court is satisfied that no serious physical or mental injury is likely to be done the plaintiff. Unless consent is given by the plaintiff to have the examination made by physicians of the defendant, the safe course is for the Court to name some disinterested physician or physicians to make such examination, but the Court and

jury ought not to be required to rely on the testimony of experts employed or produced by the plaintiff, or that of the plaintiff himself, when there is any real question about the correctness of the evidence offered by a plaintiff, in reference to the extent of his injuries.    The practice of permitting such an examination would have a tendency to prevent frauds, which are sometimes perpetrated by dishonest plaintiffs in actions for personal injuries.    In 16 *Am. & Eng. Encyc. of Law,* 810, there is an Article on the subject which cites many authorities and treats of various questions connected with it.

As to what is a seasonable time for such an application may depend upon circumstances, but it ought ordinarily to be made before the plaintiff's case is closed and, if allowed after that, the privilege should be given him to introduce further testimony on the subject.    Generally it should be done in time to avoid unnecessary delay in the trial, unless the Court is satisfied by affidavits, or otherwise, that the defendant is taken by surprise and the delay is necessary for the ends of justice.    It might be well to adopt the practice of requiring affidavits of counsel as to the necessity for such applications, and, of course, the Court should be satisfied that the application is made in good faith and not merely to affect the jury, in case of refusal to submit to the examination.    We have deemed it proper to say this much, as indicating our views on the subject, but we are of the opinion that there is nothing in this record to justify us in concluding that the discretion vested in the lower Court was abused, or should be interfered with in this case.    For further discussion of the subject see 3 *Wigmore on Ev.*, sec. 2220, and cases cited in the article above referred to in the *Am. & Eng. Ency. of Law.*

4. The plaintiff offered two prayers and the defendant twenty.    The Court granted both of the plaintiff's and the eighth, ninth, twelfth, thirteenth, fourteenth, fifteenth and nineteenth of the defendant; the last two having been granted with modifications, and the remaining prayers of the defendant were rejected.    The defendant's first, second, third and fourth prayers sought to take the case from the jury on the ground

that there was no legally sufficient evidence of negligence on the part of the defendant. They, with the special exceptions to the plaintiff's first, may be considered together. We have already said that there was ample evidence tending to show that the injuries complained of were caused by a collision of a car of the defendant with the rear of the wagon in which the plaintiff was riding. Mr. Cloman testified that he was driving slowly on the east bound track, that he heard no signal and no noise until the crash came. A witness living on the corner of Federal and Luzerne streets testified that from his house to Loney's lane (which is east of the place of the accident) the public has to drive on the tracks, because the street is in such bad condition outside of the tracks "that you can't hardly drive on it, there is no other way to drive." He also said that for three feet on each side of the tracks, the street was graded properly, but beyond that it was not graded so well, and that "The public and people generally have been driving on Federal street, between Luzerne street and Loney's lane with vehicles and wagons, ever since I have been a resident there. I can't see how wagons can drive any where's else, on account of the condition there." The railway company started to run its cars on that street about the time the witness moved there. At the place of accident and for some distance west of it there is a down grade, going east.

We therefore have before us a case in which the plaintiff and her husband were rightfully using the track of the defendant for driving on it, within the limits of the city of Baltimore, and, although the street is not paved or much built up, the conditions were such as to require care on the part of the defendant, to avoid injuring those using the tracks. Without any notice or warning a car struck the wagon, threw the occupants out, causing them to be unconscious, and because they are unable to give any further particulars we are asked to say that the plaintiff cannot recover on the ground that she has not proved negligence on the part of the defendant. If the car was being driven with such care as the conditions demanded, it would seem to have been next to impossible to

have thus run into the wagon.   At the time, there were no lights on the street, furnished either by the city or the railway company, but there was all the more reason for the company's agents using care.   It is not shown whether there was a headlight on the car, but if there was, and the car was being run with proper care, the motorman ought to have seen the wagon, and if there was not some kind of light to enable the motorman to see objects on the track, the company was negligent in not providing it.   There is nothing to show that there was any reason why the motorman could not have seen the wagon, if he was using such care as the circumstances required, and it is impossible to reach the conclusion, from the facts presented by the record, that the accident would have happened if due care had been used by him.   There is no evidence tending to show that Cloman had just driven on the track, as is suggested he may have done, but on the contrary he said "I was following the track of the railway company right straight out Federal street." ·There is, of course, no question in this State about the plaintiff being called upon to offer proof tending to establish negligence on the part of the defendant, in order to justify a recovery, but unless we announce the doctrine that a railway company can run its cars on tracks situated as these are, without regard to those who may be lawfully using them for driving on them, it would be difficult to reach a conclusion that there was no negligence on the part of this motorman, in the absence of some explanation by him as to why he did not see the wagon in time to stop.   For, as we have indicated, if he had proper lights on his car, and was running as the conditions demanded, he might have seen it in time to have avoided the accident, and if he did not have such lights as were necessary to enable him to see objects on the track for a reasonable distance, the absence of them was negligence.   There was no error in refusing to instruct the jury there was no legally sufficient evidence of negligence.

5. The sixth prayer sought to take the case from the jury on the ground of contributory negligence, while the eighth and ninth prayers of the defendant which were granted left

that question to the jury—both as to the negligence of the plaintiff and of her husband. We are of the opinion that there was no error in rejecting the sixth prayer. They undoubtedly had the right to drive on the track, and it was the custom of the public to do so. The mere fact that the curtains on the wagon were buttoned down did not make it such contributory negligence, as would have justified the Court in so declaring as a matter of law. Nor was driving on the eastbound track instead of on the westbound such negligence. When railway tracks occupy all or most of a street that can be used with due regard for the safety and comfort of the public, it is necessary for travelers to drive on the tracks, unless they abandon the use of such street which they are not required to do. It might well be questioned whether it was not safer to use the eastbound track, in going east, than the westbound, and if the public follows the ordinary law of the road the righthand track is the proper one.

In this connection we will add that the eleventh prayer was properly rejected, because there was no evidence that the plaintiff saw there was danger of a collision, or by the use of ordinary care and caution could have seen it, and in addition to that even if there had been negligence on her part, or that of her husband, the defendant was not excused for that reason, if its motorman saw, or might by the exercise of due care have seen, the wagon in time to have stopped his car.

6. The seventh prayer was liable to mislead the jury and was properly rejected. It asked the Court to instruct the jury, that the burden of establishing, by a preponderance of proof satisfactory to the jury, the state of facts alleged in the declaration, rested upon the plaintiff, "and if the testimony in this case should be such as to leave the minds of the jury in a state of even balance as to the truth of the *allegations in the declaration,* the verdict must be for the defendant." While prayers more or less analogous to that, in reference to the burden of proof, have been approved by this Court, there are many allegations in this declaration as to the injuries sustained by the plaintiff. It goes into considerable detail as to

those injuries taking a fourth, or more, of the declaration in reciting them.    If the plaintiff had failed to sustain the allegations as to some or more of them, it would not have prevented her from recovering for such as she did sustain, yet, under this prayer, if the jury had believed the testimony did not sustain "the truth of the allegations in the declaration, the verdict must be for the defendant." We see no reversible error in the modification of the fifteenth and nineteenth prayers.

7. Nor was there any such error in rejecting the three prayers (sixteenth, seventeenth and eighteenth) about Dr. Follis.    Dr. Gorsuch testified that he had been Mrs. Cloman's physician for thirty-one years, and he was examined fully as to her injuries.    The mere fact that Dr. Follis, who saw her after the accident when she was still in the city, was not put on the stand by her, although he was summoned and in Court, ought not to prejudice her case.    It frequently happens that a party to a suit does not deem it necessary to offer corroborative testimony, and in this case the defendant could have called Dr. Follis if it so desired.

8. We are also of the opinion that the twentieth prayer was properly rejected.    It asked the Court to instruct the jury "that no just criticism can be applied to the defendant because it failed to call any witnesses in its own behalf." While it may be conceded that when the Court was called upon to pass upon the prayers, as to the legal sufficiency of the evidence, it ought not to have been influenced by the failure of the defendant to offer evidence, yet when it refused to take the case from the jury on the ground that there was legally sufficient evidence of negligence, and that there was not sufficient evidence of contributory negligence as to preclude recovery, it would not have been justified in granting this prayer.    The defendant could have offered prayers at the conclusion of the plaintiff's testimony merely raising the questions of the legal sufficiency of the evidence as to its negligence and of contributory negligence of the plaintiff, and upon their rejection have offered testimony.    This was the kind of case that called upon the defendant to explain, and it

was a subject of just criticism before the jury when it failed to do so, as some matters presumably could have been explained by it, if it had seen proper.

Having considered all the material questions raised, it follows from what we have said that the judgment must be affirmed.

*Judgment affirmed, the appellant to pay the costs.*