CRITZER, et al. *v.* SHEGOGUE

[No. 12, September Term, 1964.]

412

414

*Decided October 26, 1964.*

The cause was argued before HENDERSON, C. J., and HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Wilbert McInerney* for appellants.

*Carlyle J. Lancaster* and *Jerrold V. Powers,* with whom were *Welsh & Lancaster,* and *Sasscer, Clagett & Powers* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

Appellee, plaintiff below, brought suit against appellants to recover damages for personal injuries sustained by him on January 24, 1962, when, as a pedestrian, he came into contact with a bus owned by the corporate defendant and operated by its agent, the other defendant. Plaintiff contended that he had been struck by the bus; the defendants claimed that he had walked into its side. The case was tried before a jury, which rendered a verdict in favor of the plaintiff. After motions for a judgment n.o.v. and a new trial were denied, judgment was entered upon the verdict, and defendants appealed.

The questions raised by appellants are as follows:

Did the trial court err: (1) in refusing to grant defendants' motion for a directed verdict; (2) in its instruction to the jury regarding the duty imposed upon a motorist to a pedestrian; (3) in instructing the jury "concerning the duty imposed upon each party by the doctrine of 'last clear chance' to avoid the accident."; (4) in instructing the jury "regarding the failure of the defendant to call a witness."

On the day of the accident, plaintiff and his two brothers had spent several hours at a Hyattsville bowling alley, where they bowled and consumed some beer. After leaving the bowling alley and making one stop at a restaurant, they proceeded in an easterly direction along the Lanham-Severn Road, a highway accommodating two lanes of traffic. The motor in the car in which they were traveling stalled, and the plaintiff, who was due to be at work in Washington at 9:00 p.m., began walking easterly along the right side of the highway in hope of obtaining a ride to his home at Bowie. Because the shoulder of the roadway was in poor condition, plaintiff stated that he walked alternately on the paved surface and on the shoulder, depending upon the amount of traffic using the road. The testimony is conflicting concerning whether he was walking on the surface or on the shoulder of the road at the time when contact with the bus occurred. The testimony is also conflicting as to whether plaintiff walked into the side of the bus, as to its speed, and whether there was an odor of alcohol on plaintiff's breath following the accident. Additional facts will be added, as needed, in the consideration of the questions presented.

## I

It is elementary that in passing upon the propriety of denying a defendant's motion for a directed verdict, the evidence must be considered in a light most favorable to the plaintiff; and it is only where there is no evidence of negligence by the defendant or evidence from which such negligence may be legally inferred that the court is justified in taking the case from the jury. *Olney v. Carmichael,* 202 Md. 226.

Plaintiff testified that he had worked for the Pennsylvania Railroad for 23 years; he had consumed one bottle of beer and part of another while bowling during the afternoon (his brother thought that plaintiff "drank a couple"); the weather was "bitter cold," it had sleeted in the morning and the afternoon, and it was drizzly; he was walking easterly on the gravel (or shoulder) portion of the road and when he got in front of a Mrs. Morgan's home, there was some sod just beyond the gravel shoulder, which he found easy to walk upon; he proceeded past Mrs. Morgan's to a Mrs. Weaver's property where

there was also a sod extending about three feet from a hedge; he saw the bus approaching when it was some 100 to 400 feet away; he was standing "quite a ways off the edge [of the paved portion] of the road"; he realized that if he remained standing there, the bus driver would not "recognize the fact that [he] wanted to board the bus"; he took a couple of steps "toward the edge of the paved road with [his] hand extended," and stopped around two feet or a little more from the paved portion of the road; the bus bore down on him fast (30 to 50 miles an hour) and he realized the driver of the bus did not intend to stop; the last thing he saw was "that mirror and corner of the bus," he whirled quickly to his right and the bus "caught [him] on this corner and broke everything from my shoulder to my left buttock"; the next thing he remembered was that he was in the hospital. On cross, he stated that he was not watching the wheels of the bus, hence he could not definitely tell whether the bus left the paved portion of the road, "but it looked like it to [him]."

One of plaintiff's brothers corroborated plaintiff's testimony relative to the events that occurred during the afternoon down to the time plaintiff left the stalled automobile to go home and then to work. A witness, Munday, a member of a volunteer fire company, reached the scene of the accident shortly after the collision; the closest part of plaintiff's body was approximately four feet from the paved portion of the road; the witness got down very close to plaintiff's face to check on his breathing, but detected no odors on his breath; the bus was some 120 to 150 feet from where the plaintiff was struck. When the witness Himelright, in charge of the rescue squad at Glen Dale, arrived at the scene, plaintiff was lying "on the grass," and, in checking his breathing, the witness noticed no odor of alcohol on his breath.

Dr. McCeney, the Shegogue family physician, testified that he examined the plaintiff on the evening of the accident; he found that there were breaks in the back of plaintiff's ribs on the left side from the fifth to the eleventh, and breaks in the front of the seventh, eighth and ninth on the same side; this indicated to the doctor that the force breaking the ribs had to come from the left side. The doctor also discovered a large

bruise (which came later) on the plaintiff's buttocks and abrasions on his eye and left hand. It was uncontroverted that these injuries resulted from the collision.

One of appellants' witnesses, a passenger on the bus, said he saw appellee shortly before he was struck and when he last saw appellee, he was walking about two feet over on the shoulder. An officer of the Police Department, who investigated the accident and was called by the appellants, stated that the bus driver told him at the scene that "something hit the side of the bus and he pulled to the side of the road to investigate what the object was and found it to be a pedestrian." The bus driver, one of the appellants, testified that he was running what is known as a commuter run (this run is also known as a flag-stop run, which means that prospective passengers may "flag" it to stop at any convenient spot) ; it was dark; he saw appellee, a couple of feet off the hard surface, walking in the same direction that the bus was traveling, and just as he "got abreast of him, the corner of the bus, he suddenly came to the left, right end of bus, so I swerved as far as I could swerve" to the left. The witness heard a thump on the side of the bus, pulled off the road, stopped the bus, and ran back down the road where he found appellee lying with his feet, the nearest part of his body to the hard surface, some two or three feet therefrom. Two or more of appellants' witnesses, passengers on the bus, testified that the bus did not leave the paved portion of the highway, and another stated that just before the collision she and another passenger exclaimed "look out," the driver swerved to his left, and she heard the thud.

The above evidence was sufficient to take the case to the jury on at least two theories. From it, the jury could have found (although they could have adopted appellants' theory as to how the accident occurred) that the plaintiff was struck while walking on the paved portion of the highway because of the driver's failure to keep a proper lookout, or that the driver carelessly ran into the plaintiff while he was on the shoulder attempting to flag the bus to a stop.

## II

It would serve no useful purpose to set forth in detail that portion of the court's instructions objected to under this head-

ing. Appellants contend that the court placed a greater duty with respect to the use of the highway on the part of a motorist to a pedestrian than the law imposes. A careful reading of the charge, we think, discloses that the court's instructions did not conflict with our restatement of the rule in *Wiggins v. State,* 232 Md. 228, wherein, in substance, we said that in the absence of special circumstances, pedestrians using public highways (without the confines of towns and cities and not at intersections) have a duty to watch for and expect to find approaching vehicular traffic thereon, and drivers of motor vehicles have a corresponding duty — particularly where there are no sidewalks—to watch for and expect to find pedestrians walking on or off the sides of the highway. We find no error here.

### III

During the course of instructing the jury, the court stated:

"If you further find that the driver of the bus either saw or should have seen the pedestrian in a position of peril or danger, then it was his duty to take whatever steps were within his power to avoid injury to the pedestrian. And likewise, if the pedestrian found himself in a position of peril he is required, under the law, to do everything that is necessary to take himself from that position of peril, if you find that he has placed himself in such a position."

Appellants take the position that the above was an instruction on the doctrine of last clear chance, which should not have been given in the case. Although we find in the two quoted sentences some of the phraseology generally used in a proper last-clear-chance instruction, an analysis of the sentences shows that they do not include the essential elements of a last-clear-chance instruction. As we stated in *State, etc. v. Barlly,* 216 Md. 94, the doctrine presupposes a perilous situation, created or existing through the negligence of both the defendant and the plaintiff. It assumes that there was a time after such negligence has occurred when the defendant could, and the plaintiff could not, by the use of the means available avert the accident. Consequently, this Court has held on many occasions that in

order for the rule to apply the defendant's negligence must have been sequential and not concurrent. Clearly the sentences quoted do not cover such a situation; and the trial court specifically stated that they were not intended to cover the doctrine of last clear chance.

An examination of the first sentence (the second sentence does no harm to the defendants) in the light of what we have just said reveals that it amounts to no more than an instruction on ordinary care and caution; namely that if a motorist sees, or should have seen, a pedestrian in a position of danger, then he, as an ordinarily careful and prudent person, should use the means available to him to avoid injury to the pedestrian. This duty on the part of a motorist is basic and fundamental, and to state that there is no such duty would be tantamount to a holding that a motorist could, without responsibility therefor, recklessly or deliberately injure a pedestrian. We find no prejudicial error in this portion of the instructions. (What we have said above is not to be construed as an approval of the second sentence. As stated above, it did not prejudice appellants' cause; hence we do not reach the question as to whether it was proper.)

IV

At the request of the plaintiff, the court included in his instructions, over objections by the appellants, the following:

> "I further instruct you in this case that if a party to a suit is able to produce a witness who *may* have knowledge of the facts and fails to call that witness or explain his absence, his inability to produce him, then there is a *presumption* his testimony would be unfavorable to that party to the suit." (Italics added.)

Although nothing more was said in the instructions concerning this proposition, it was directed to the failure of the defendants to call Joseph E. Heilig, an employee of the corporate defendant, who was another bus driver and a passenger upon the bus involved herein. This witness was in court at the time of trial. Plaintiff's attorneys had taken a deposition from him, in which, *inter alia,* he had stated that he had known the plaintiff all of witness' life; on the night of the collision, he did not

see the plaintiff before the accident because, although he was standing behind the operator of the bus, he had his head turned "all the way around" talking to some passengers; consequently, he did not see the collision. The remainder of his deposition was, in general, cumulative of evidence that had been adduced by the appellants. The deposition was not proffered as evidence, and, insofar as the record discloses, it was not called to the court's attention. Nor was any evidence produced to show what the witness knew or did not know.

The question is treated rather summarily by both sides in their briefs. The appellants cite but one previous decision of this Court, *Joppy v. Hopkins,* 231 Md. 52, in which we held that it was not error to deny an instruction to the effect that a failure of a party to call an available witness created a presumption that his testimony would have been unfavorable to the party who failed to call him where there was no evidence to indicate that his testimony would not have been merely cumulative. And the appellee cites no case or other authority supporting his position. However, our independent research discloses that the question has been considered and elaborated upon by many text writers and in many well-reasoned opinions by the Courts. 2 *Wigmore, Evidence,* §§ 285, *et seq.,* and the numerous cases there cited; *McCormick, Evidence,* § 249; 31A C.J.S., *Evidence,* § 156; *Jones, Evidence,* §§ 27, *et seq.;* 20 Am. Jur., *Evidence,* §§ 183, *et seq.,* and the many cases cited in these authorities. Some of the Maryland cases dealing with the subject are: *Berger v. Bullock,* 85 Md. 441; *Keller v. Gill,* 92 Md. 190; *Zimmerman v. Bitner,* 79 Md. 115; *Hiss v. Weik,* 78 Md. 439; *Turner's Executor v. Turner,* 98 Md. 22.

Am. Jur., *op. cit.,* states the general rule thus: "It is a well-established rule that where relevant evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and he fails to do so, without satisfactory explanation, the jury may draw an inference that such evidence would be unfavorable to him. This rule is uniformly applied by the courts and is an integral part of our jurisprudence." The questions relative thereto arise upon the propriety of the court or counsel remarking upon such a failure, upon the granting by the court of an instruction

thereon, or statements relative thereto in appellate decisions. To the general rule, as stated above, there are qualification and limitations. *Joppy v. Hopkins, supra. United Rys. & Elec. Co. v. Cloman,* 107 Md. 681 *Wright v. Rever,* 151 Md. 558; *Wigmore, op. cit.,* §§ 286 *et seq.; McCormick, Evidence,* § 249. However, we do not deem it desirable to attempt to set forth any precise rule with all of the exceptions thereto, for, in passing upon such exceptions, it is often necessary for the trial judge to take into account all of the attendant facts and circumstances bearing upon the situation presented before him. *Wigmore, op. cit.,* Supp. to Text, p. 171. Compare *McCormick, Evidence,* § 249. Each case must be determined upon its own facts and surrounding circumstances.

In the instant case, it was shown that the witness Heilig was an employee of the corporate defendant, that he was a passenger upon the bus standing behind its operator at the time of the accident, and was in court but was not called by said defendant. Ordinarily, a showing of these facts, standing alone, would justify plaintiff's counsel in calling the jury's attention to an inference (some cases use the term presumption) as mentioned above, or the court's granting a proper instruction thereon. Cf. *Chicago & N. W. Ry. Co. v. Kelly,* 84 F. 2d 569 (C. A.); *Patton v. Oakman,* 299 N. W. 761 (Mich.). However, when it is shown why the witness was not called upon to testify and the reasons for not calling him are reasonable and proper, no inference that his testimony would be unfavorable is permitted. II *Wigmore, Evidence* (3rd Ed.), § 290 (3). In *United Rys. & Elec. Co. v. Cloman, supra,* a Doctor Follis had examined the plaintiff shortly after she received injuries for which she sought damages. This witness was in court, but was not called. A Dr. Gorsuch, who was plaintiff's family physician, testified as to her injuries. Defendant requested a prayer, which would have instructed the jury that they "may infer that his testimony would be unfavorable to the plaintiff," because she failed to produce Dr. Follis as a witness. This prayer was refused. The Court held that after Dr. Gorsuch had been examined as to her injuries, the plaintiff's failure to call Dr. Follis should not prejudice her case, stating that "it frequently happens that a party to a suit does not deem it necessary to

offer corroborative testimony, and in this case the defendant could have called Dr. Follis if it so desired."

In *Wright v. Rever, supra,* the question involved was whether a man had made a written assignment of an insurance policy to his brother. The assignment could not be located. The policy (and presumably the assignment if it, in fact, had been executed) was, for a time, in the possession of the Hamilton Bank. Certain officers of the bank were called by the defendants and testified that they simply did not remember whether an assignment was attached to the policy while it was in the bank's possession. This Court held that this testimony "readily accounted" for plaintiffs' failure to call the officers and the chancellor was not entitled to draw an unfavorable inference against the plaintiffs for failing to produce the officers.

In *De Gregorio v. United States,* 7 F. 2d 295 (C. A. 2d; Rogers, Hough and Learned Hand, JJ.), the legality of two police officers' entry was questioned. One only of the officers was called to testify, and the court refused to charge that the failure to call the other officer created an inference that his testimony would have been unfavorable to the prosecution. In upholding this ruling the Court stated: "The rule has been much misunderstood, and is often misapplied. It does not obtain when the uncalled witness is purely cumulative, and when he was not in a better position to know the facts than those who were called. [Citations, including *Cloman, supra.*] Any other rule would require a party to call all eye-witnesses at the risk of having it presumed that those not called would contradict those who were. The rule has no such purpose; it rests on the motion that the suppression of more cogent evidence than that produced is some indication that it would be unfavorable."

Under the circumstances of the case at bar, we think that plaintiff's counsel, when they requested the instruction, were duty bound to inform the court of the deposition; and when the court discovered that the witness Heilig did not actually witness the accident, and therefore did not know the facts so well as the witnesses who were called by the defendants, he should not have granted the instruction.

And we are unable to find that the instruction was harm-

less error. It is couched in very general terms, and these terms were such that they tended to mislead the jury. The jury was instructed that if a party is able to produce a witness who "may" have knowledge of facts, etc., the "presumption" arises. Does this mean that a party must explain his not calling every witness who "might" in the minds of the jury have knowledge of relevant facts? We have found no case or authority that attributes such a wide scope to the rule. Also, there is no intimation in the instruction as to the effect of the "presumption," such as whether it is a substitute for substantive proof of any fact essential to the case of the party invoking the rule. Cf. 1 *Jones, Evidence,* § 30; *McCormick, Evidence,* §§ 249, 308; II *Wigmore, Evidence,* § 290(4). Therefore, without, as we stated above, attempting to lay down a hard-and-fast, precise rule to cover the myriad of conceptual ramifications resulting from a failure to produce evidence, we hold that under the circumstances prevailing herein it was prejudicial error to grant the instruction quoted above.

> *Judgment reversed, and case remanded for a new trial; appellee to pay the costs.*