## JOSEPH LEVIN *v.* CARLOS E. ARRABAL

[No. 250, September Term, 1970.]

*Decided January 28, 1971.*

The cause was argued before ORTH, THOMPSON, and POWERS, JJ.

*Matthew Swerdloff* and *Allan B. Rabineau* for appellant.

*John J. Hirsch,* with whom was *Paul L. Wilkins* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

Asserting error leading to the judgment for Dr. Carlos E. Arrabal against him for damages resulting from collision of two automobiles on a shopping center parking lot, Joseph Levin seeks reversal of that judgment, and a new trial.

Questions briefed and argued by appellant are:

I. Did the lower court err in granting the plaintiff's motion for directed verdict on the issue of:
    a. Primary negligence?
    b. Contributory negligence?
II. Did the lower court err in directing a verdict on liability?
III. Did the lower court err in refusing to grant the defendant's request for instruction No. 2?
IV. Did the lower court err in refusing to grant the defendant's request for instruction No. 7?
V. Did the trial court err in refusing to strike portions of Dr. Groll's testimony?
VI. Was the jury required to speculate and engage in conjecture relative to loss of earning capacity in the future as an element of damages?

Recital of the evidence concerning the collision is necessary to view Questions I and II in the perspective of applicable law.

The collision occurred shortly after 2:00 P.M. on April 23, 1965 on the lot of Mondawmin Shopping Center in Baltimore. Officer James Saunders of the Northwestern District came to the scene in response to a call. He testified from a copy of the report he originally made. He drew a diagram showing a driving lane, divided by a center line, indicating the west side for southbound traffic, and the east side for northbound traffic, with parking spaces abutting each side of the driving lane. He said he was told the cars had not been moved, and sketched their locations as he said he found them. The Arrabal car was shown headed south in the southbound lane; the Levin car was shown headed west, astride the center line, and against the left front of the Arrabal car. He indicated the place where Levin said he came from and said other cars were parked in some spaces in that area but he could not say how close. He could not say if there was any debris on the roadway. He said that according to his report it was raining.

Dr. Arrabal's version of what occurred is shown by the following in his direct examination:

"Q What happened to you as you were driving from north to south towards Gwynns Falls Parkway?

A I was approaching—I was driving approximately this point located on the diagram when I saw this car suddenly coming between parked cars, and hit my car with a terrific impact."

\* \* \*

"A I suddenly saw him coming. When I saw him I couldn't do anything."

\* \* \*

"A I asked Mr. Levin what were you doing; didn't you see anything, and he said to me, I am sorry, I didn't see you at all."

and in his cross-examination:

"Q And when you got in the car, and got out on the parking lot, out from the parking space into this driveway, did you put your windshield wipers on?

A It wasn't necessary. It was that light. It was drizzling light."

\* \* \*

"Q When you first saw him, was he already in the driving lane, or was he still in a parking space?

A He was coming in-between two parked cars getting into the driving lane.

Q Was the front of his car in the driving lane when you first saw him?

A Yes."

\* \* \*

"Q Now when you first saw him in this driving lane—the front of the car in the driving lane, can you tell how far you were from his car?

A I would say the length or the width of the

driveway, which would be approximately three cars wide."

Mr. Levin said that he left Read's lunch room and went to his car on the lot, and then gave this testimony:

"It was raining very heavily, and I came out to my car, got in my car, started my car, let it warm up a little bit, proceeded north two lanes in front of me, which was two spaces in front, and no cars on the lefthand side of me. There were some cars to the right, and were some cars parked further up on the parking lot. And as I proceeded to go forward—going north then to make a righthand turn into what I considered a designated in lane in the Mondawmin Shopping Center leading north from Gwynns Falls Parkway, when I started up—started proceeding in this lane, as I did, I saw a car coming toward me. It was about ten feet away when I saw it, put my brakes on, skidded, couldn't stop, and we collided."

Levin also testified that he applied his brakes and skidded four or five feet.

The following, from his cross-examination, presents part of Levin's version of the collision:

"Q So actually you were the striking vehicle, isn't that correct?

A Only because he was in the wrong lane, sir.

Q Are you saying the officer where he placed Dr. Arrabal's car is the wrong lane?

A Yes, sir.

Q I see. And you also say it was raining very hard?

A Yes.

THE COURT: Where was Dr. Arrabal's car then when your cars came together?

A They remained the same as it was in the

east lane, or the in lane as I consider it. The in lane of that driveway. There are two lanes. It is divided by a yellow or white line. Of course it could not be visible at the time but there are two lanes I considered—well, all cars driving in the Mondawmin Shopping Center consider it the in lane and it is that way from Gwynns Falls Parkway into the shopping center. The out lane is the west lane heading out of the shopping center.

Q (Mr. Hirsch) Well, you say he was coming south in the east lane?

A That's right. He was approximately almost to the other side of the lane when I saw him. Of course, I realize now, but I didn't at the time, but it would be hard for me to see him coming, because of the Big Valu Store on that side. He was close to that side."

* * *

"THE COURT: How far did you go before you started to make your righthand turn?

A About twenty feet.

THE COURT: Did you drive in the slot, or was there a car which would be parked in front?

A No. There was no car in front of me at all."

* * *

"MR. SWERDLOFF: And what, if anything, was to your left when you looked?

A There weren't any cars to my left — directly to my left."

* * *

"MR. HIRSCH: Did you look to your right?

A Of course, when I got to my lane.

MR. HIRSCH: When you looked to your right did you see the car coming down?

A Of course not. I couldn't see until it was close to me. It was on the inside lane—was in the lane that I was going to take."

* * *

"THE COURT: How far to your right could you see?

A I could see the end of the food market.

THE COURT: The Big Valu shown there?

A That's right.

MR. SWERDLOFF: Mr. Levin, you say that when you saw Dr. Arrabal's vehicle ten or twelve feet from you, which way were you looking?

A To the right.

MR. SWERDLOFF: Was that the first time, or second time, or third time you looked to your right?

A The second time."

\* \* \*

"MR. SWERDLOFF: How fast were you traveling?"

\* \* \*

"A I would say—I don't know. I'm not an expert at speeds. I would say fifteen—twenty miles an hour."

There was evidence admitted without objection or by stipulation that the repair of the Arrabal car cost $347.-65, that he paid $100.01 for car rental, and that treatment and x-rays at the emergency room of Mercy Hospital cost him $60.00.

At the close of all the evidence, and after the jury was excused, plaintiff submitted a written motion entitled "Motion for Directed Verdict" in which he asked the court to "grant him a directed verdict as to the issues of the defendant's liability and the plaintiff's absence of contributory negligence".

Argument then took place on plaintiff's motion and Judge Jones, after summarizing her reasons, ruled: "So I am going to grant the verdict on liability, and submit the case to the jury on the issue of damages".

## I

Applying the applicable rule as expressed in *Buchanan*

*v. Galliher,* 11 Md. App. 83,     A. 2d    , (1970), and measuring the conduct of the parties solely by the standard of ordinary care under all the surrounding circumstances, the evidence in this case raised issues of both primary negligence and contributory negligence which required that they be weighed and determined by the jury, and not as a matter of law by the court.

In *Atran v. Furness,* 251 Md. 216, 222-24, 246 A. 2d 767 (1968) the Court of Appeals pointed out that Code (1967 Repl. Vol.), Art. 66½, § 231, did not govern right of way at an intersection of roadways in a Baltimore County shopping center, because they were not public roads.[1] In that case the Court approved an instruction that the applicable standard of care "would be the care of an ordinary, prudent person, driving under similar circumstances and at the time that this particular accident took place."

From the evidence a jury could believe that the roadway through the shopping center was divided by a center line, with the west side for southbound traffic and the east side for northbound traffic; that it was wide enough for three cars; that all cars driving in the center consider the east lane the incoming lane from Gwynns Falls Parkway and the west lane the one for heading out; that it was raining hard and Levin had his windshield wipers on, but Arrabal did not; that Levin drove through a parking space and entered the roadway to turn right and head north on the east side; that before he entered the

---

1. Acts of 1967, ch. 718, then codified as Art. 66½, § 317B provided that in Prince George's and Talbot Counties "* * * any person operating a motor vehicle on private property which is used by the public in general in violation of the provisions of this subtitle shall be deemed in violation of the law to the same extent as if the motor vehicle were being operated on a public highway and the violation carries the same penalty." By Acts of 1969 ch. 601 Allegany, Baltimore, Cecil, Frederick, Howard and Washington Counties were added. Anne Arundel, Carroll and Charles Counties were added in 1970. The section is now codified as Art. 66½, § 11-101.

Former § 188 now § 15-103 of Art. 66½, allowing the owner of property used by the public for vehicular travel by permission and not as a matter of right, to regulate such use as he may deem best has remained virtually intact since it was enacted in 1943.

roadway he looked to the left and there were no cars coming in the lane he was going to take; that he looked to the right before he entered and saw no cars coming; that after he entered he looked again and saw the Arrabal car, about 10 or 12 feet away, southbound in the wrong lane, and they collided in the east, or northbound lane.

We do not mean to imply that the evidence we have recited above represents the preponderating effect of all the evidence, but it is not for us, any more than it was for the trial judge, to weigh that evidence against the rest, nor to resolve the conflicts thus presented. This is precisely what the jury was for.

## II

Appellant contends it was reversible error to direct a verdict for the plaintiff on liability. Though it is unnecessary for us to decide this point, we observe that the form of the ruling on this point was not incorrect, because there were conceded damages sustained by Arrabal. The harmless error discussed in *Peroti v. Williams,* 258 Md. 663, 267 A. 2d 114 (1970) and the rule explained in *Richardson v. Boato,* 207 Md. 301, 114 A. 2d 49 (1955) would not apply. See footnote 2 in *Peroti,* page 670, which says, in part, "If negligence is established and some injury conceded, but the amount disputed, a verdict on liability may be directed, leaving for determination by the jury the amount to be awarded." In the present case, as in *Peroti,* the court in effect gave the jury a peremptory instruction on negligence.

## III

When the judge completed instructions appellant excepted and, referring to two physicians who had been mentioned, stated, "I think the jury ought to be informed that the fact they were not here, it can be assumed that their testimony would be prejudicial or an inference could be drawn that the testimony of those two witnesses, Dr. Weinberg and Dr. DeBorja, would not be favorable to-

ward the plaintiff's case." The prayer referred to as number 2 more correctly stated the rule by including the element of failure to explain the witnesses' absence. The rule stated and discussed in *Joppy v. Hopkins*, 231 Md. 52, 188 A. 2d 545 (1963); *Critzer v. Shegogue*, 236 Md. 411, 204 A. 2d 180 (1964), and *Jacobson v. Julian*, 246 Md. 549, 229 A. 2d 108 (1967) does not help the appellant. The principle is simply not applicable because Arrabal in his testimony explained that Dr. Weinberg had told him he was completely retired, could not do an examination, would not be available for trial and it was not possible to testify. As to Dr. DeBorja, Arrabal testified that he was a personal friend, not his private physician, had examined him some months ago but not for the purpose of coming to court, and had given him some advice.

### IV and V

These two points argued by appellant may be considered together. He excepted to the denial of a requested peremptory instruction that there was no legally sufficient evidence that the injuries of the appellee disabled him "at the present time" from pursuing his regular occupation, or were the competent producing cause for the necessity of his changing his practice of medicine. He also argues the trial judge erred in denying his motion to strike the testimony of Dr. Groll that the injuries were caused by the accident. Dr. Groll's qualifications are not questioned. His care, treatment and diagnosis of appellee established a sufficient basis for his opinion that the injuries were caused by the accident.

The weight of his testimony, and of Arrabal's testimony that his back disability caused him to change from the practice of obstetrics and gynecology to general practice, was for the jury.

### VI

Appellant argues that it was error to permit the jury to speculate on the issue of loss of future earning capacity as an element of damages.

The basic damage instruction given was:

"Now with regard to the matter of damages, you are instructed that the plaintiff, Dr. Arrabal, has the burden of proving to you by the weight of the evidence each and every element of loss, or injury, or damage which he claims to have sustained as a result of this accident, and you are not to award any damages on any element of loss, or injury, or damage claimed which has not been proved to your satisfaction from the weight of the evidence to have resulted from the accident. If there is any element of damage that has not been proved from the weight of the evidence, or if your minds are in a state of even balance, then this would mean the burden of proof has not been met, and you would not award damages on that particular element, which has not been proved."

Elaborating upon this general instruction, the Court said:

"You may take into consideration, if you so find, whether he has sustained any injuries which are permanent in their nature, and if so, to what extent, if any, such disability is calculated to disable him from engaging in those activities, or pursuits, or employment for which he would have been qualified in the absence of such injuries."

and further said:

"And you may also take into consideration, if you so find, any loss in the future of his capacity to earn, as the natural and proximate or direct consequence of the injuries complained of."

The Court concluded the instructions by saying:

"Now these various elements which you may take into consideration in determining the damage, again, as I have said before, are subject to the burden of proof instruction that I gave you

in the beginning. You would award such damages as in your judgment would be fair, and just, and adequate compensation for the losses proved to your satisfaction to have resulted from this accident. And of course you would not engage in the realm of conjecture, or guesswork, in determining damages."

No exception was taken to any of these instructions, nor is it argued here that there was any error in them. We fail to see how the jury, thus instructed, was permitted to speculate on the issue of loss of future earning capacity.

- - - - - - - -

No error appears in that part of the trial dealing with damages, nor the jury's determination of the amount, and since the reversible error affects a severable part of the matters in controversy, no retrial of damages is necessary. Maryland Rule 1072. We will reverse and order a new trial as to negligence only.

> *Judgment reversed, and remanded for a new trial as to negligence only. Costs to abide the result.*