944 A.2d 538

**Bruce C. BEREANO**

v.

**STATE ETHICS COMMISSION.**

No. 32, Sept. Term, 2007.

Court of Appeals of Maryland.

March 19, 2008.

Reconsideration Denied May 5, 2008.

---

Timothy F. Maloney (Joseph, Greenwald & Laake, P.A. of Greenbelt), on brief, for petitioner.

Steven M. Sullivan, Solicitor General (Douglas F. Gansler, Attorney General of Maryland, of Baltimore), on brief, for respondent.

Argued before HARRELL, GREENE, LAWRENCE F. RODOWSKY (Retired, specially assigned), ROBERT L. KARWACKI (Retired, specially assigned), RAYMOND G. THIEME, JR. (Retired, specially assigned), WILLIAM W. WENNER (Retired, specially assigned), and JAMES S. GETTY (Retired, specially assigned), JJ.

HARRELL, J.

With apologies to the actual dialogue snippet of the character of Captain [1] in the movie COOL HAND LUKE, "What we have here is [a] failure to [agree completely as to reasoning]." This case results in three opinions with the members of the Court strewn across that landscape. Nonetheless, the views shared by myself and Judges Greene, Karwacki, and Wenner, joined in part by Judge Rodowsky (as explained in his concurrence), result in a majority opinion and judgment of the Court.

Petitioner, Bruce C. Bereano, raised two questions in his petition for writ of certiorari:

I. Whether the enforcement provisions of the Maryland state ethics laws may be applied retroactively to an agreement that was executed two months before the statute was enacted?

II. Whether the "missing witness rule" should be applicable to administrative agency proceedings in Maryland, and even if it can be, did the Commission commit reversible error by misapplying the rule by violating petitioner's due process rights to notice and an opportunity to be heard, shifting the burden of proof to petitioner, and ignoring the "peculiar control" requirement?

The Court is unanimous in its disposition of the first issue as explicated in Part I of this opinion. We part company, however, as to the disposition of the second issue. Part II of the Court's opinion is joined in its entirety by myself and Judges Greene, Karwacki, and Wenner. In a concurrence,

---

1. As portrayed by the late character actor Strother Martin.

Judge Rodowsky explains what portion of Part II he joins, as well as why he joins the judgment. A dissent by Judge Theime, joined by Judge Getty, reveals why they are unable to subscribe to Part II of the Court's opinion or the judgment.

The result is that the judgment of the Court of Special Appeals shall be reversed and the matter remanded to that Court with directions to reverse the judgment of the Circuit Court for Howard County and further remand the case to the Circuit Court with directions that it reverse the final decision of the State Ethics Commission and remand the case to the Commission for further proceedings not in consistent with this opinion.

## I.

## FACTS

Petitioner Bereano failed to convince the State Ethics Commission (the "Commission"),[2] the Circuit Court for Howard County, and the Court of Special Appeals that he did not knowingly and willingly violate Maryland Code (1984, 2004 Repl.Vol.), § 15–713(1) of the State Government Article. He now solicits this Court to find error in the determination that he was engaged for lobbying purposes for compensation contingent upon executive or legislative action.[3]

## A.

The material facts in large measure are undisputed, although their consequences are not. In September of 2001, Bereano, an experienced lobbyist of many years, entered into an agreement to provide lobbying and consulting services to Mercer Venture, Inc., d/b/a Social Work Associates (Mercer).

---

**2.** We shall refer to the deciding authority, the State Ethics Commission, as "the Commission," as distinguished from its counsel and staff involved in the investigation and hearing.

**3.** The original complaint concerned three of Bereano's clients. After hearing evidence, the Commission granted judgment in favor of Bereano with regard to two of those cases.

The terms of this agreement were set forth in a letter from Bereano to Mike Traina of Mercer, dated 1 September 2001. This was signed by Traina on 13 September 2001. The letter began with a reference to "our discussions," and, in its first paragraph, stated:

I propose to represent Mercer Ventures in the State of Maryland in a lobbying, political consulting, and·strategy development capacity relative to the Company's plans to develop and obtain contracts and arrangements with various county, municipal, and State government agencies and departments in order to provide and perform on a privatized basis staffing agencies and case management functions. In addition, I ·would be willing and able to assist your company with any business development and activities in other states and jurisdictions outside of Maryland.

Paragraph two provided:

I propose commencing the month of September 1, 2001, a monthly retainer fee of $2,000.00 plus reimbursement for any necessary and reasonable expenses such as postage, duplicating costs, long distance telephone calls, mileage, fax expense, and *legislative meals· and entertainment.* Any significant or unusual expenses would have to be approved and authorized by you before being incurred. These fees and expenses would be paid and continue on a regular basis once your company attains a financial cash flow, and ability to do so.

(Emphasis supplied.)

Paragraphs three and four amplified the services to be provided:

The nature and scope of my services for the monthly retainer would include and encompass performing lobbying services, giving advice, consultation, strategy and be a resource concerning legislative and political and government matters at both the State and local levels, attending and participating in all necessary and required meetings, monitoring and watchdogging on behalf of the Company, and providing information to your companies as to matters of

concern and importance with its work and relationships with the State of Maryland, as well as any political subdivision in the State and generally performing any and all other such similar and related services and activities as you may request of me. In this regard, I also would register as a lobbyist and fully comply and conform with the State's applicable law.

It is further understood and agreed that in addition to and separate and apart from payment of the aforementioned monthly fee retainer fee and any further increase thereof, Mercer Ventures will compensate and further pay me one percent (1 %) of the first year receivable for continuing representation and services be performed, provided, and made available when and after each separate facility and/or site or location that is opened in which I was involved in securing and participated in obtaining, and/or any contract and performance of services which is entered into by your company with any government entity, unit or agency in the State of Maryland or any other state or jurisdiction in which I worked on the matter.

Next, Bereano addressed the subject of relationships with non-governmental entities:

As to and concerning any private contracts and business which I assist and help on obtaining for your company it is understood and agreed upon that separate from and in addition to any monthly fee arrangement as set forth herein I also will receive and be paid a monthly agreed upon bonus and reward for each such private contract or business.

As summarized by the Court of Special Appeals in its reported opinion in this case, the following resulted from the signing of this document:

On November 13, 2001, Bereano filed a lobbying registration form with the Commission, declaring, under oath, his intention to perform executive and legislative action lobbying on behalf of Social Work Associates, a subsidiary of Mercer. Bereano indicated that the effective date for lobbying on behalf of Social Work Associates for "any and all

legislative and executive matters concerning staffing and case management foster care, children and social services issues" was November 1, 2001 to October 31, 2002.

Later, on December 1, 2001, Bereano sent an invoice to Mercer requesting a $2,000 retainer for the months of September, October, November, and December. He also requested payment for expenses that included long distance phone calls, mileage, duplicating, and $393.34 in "Legislative Meals [and] Expenses." Again, in an invoice dated January 16, 2002, Bereano requested payment in the amount of $24,000 for "professional [s]ervices [r]endered," and a $2,000 retainer for January. He also sought reimbursement for expenses, including $454.39 in "legislative meals and expenses." Bereano sent similar invoices to Mercer billing for his monthly retainer fee and seeking reimbursement of "legislative expenses," meals and entertainment, mileage, duplicating, and long distance telephone calls on February 6, 2002, March 1, 2002, April 1, 2002, May 1, 2002, and June 1, 2002.

Traina sent Bereano a letter dated May 17, 2002, detailing Mercer's recent projects. The letter was accompanied by an "Organizational Capability" statement, listing among Mercer's "major clients" the following State Agencies: the Department of Public Safety and Correctional Services; the Department of Assessments and Taxation; the Department of Health and Mental Hygiene; the Department of Business and Economic Development; and the Department of Human Resources.

*Bereano v. State Ethics Commission,* 174 Md.App. 146, 156, 920 A.2d 1137, 1143 (2007).[4]

On 12 June 2002, Traina wrote to Bereano that he had learned of an investigation by the press into whether paragraph 4 of their agreement was a prohibited contingency fee.

---

4. No retired member of this Court or the Court of Special Appeals recalled to sit specially on the present case participated in any way in the Court of Special Appeals's consideration of or decision in this matter.

Although Traina told Bereano he considered this a "misinterpretation," he requested that their contract be amended to delete that language. Bereano agreed.

In addition, Bereano filed with the Commission an amended report on his lobbying activities on behalf of Mercer. In his initial report, dated 31 May 2002, he listed compensation for lobbying activities during the period of 1 November 2001 through 30 April 2002 as $139,379.46. On 13 June 2002, he changed that figure to $17,579.46. In a later report, filed on 2 December 2002, Bereano stated that he had performed lobbying activities on behalf of Traina's business from 1 May 2002 through 31 October 2002, for which he had received a total o f $10,000.00.

The Commission's staff initiated a complaint against Bereano on 19 September 2002. A hearing on the merits began on 25 June 2003. Throughout his testimony, Bereano insisted that paragraph 4 of the 1 September 2001 letter agreement did not create a contingency agreement. He stated repeatedly that he was an experienced lobbyist and legislative draftsman who knew of the longstanding prohibition against contingency fees. He explained the intent of this paragraph as follows:

> If—what is in the separate arrangement here is that by providing further services, in other words working, continuing representation and services to be performed, I would be paid for additional work and services, not a success fee, not a bonus, not an outcome situation. In other words, the language in here for continuing representation and services to be performed, I would have to work for that; and that is why those words are in there.
>
> Now, this has never come to be, but just in discussing it in answering your question, Madam Commissioner, those words are there and were intended to be there to mean that you're not going just to get something and not do anything or what have you. You're going to have to continue working and provide services.
>
> . . .

As long as, and that's why this language is in here, I continued to perform work and services. As clear as the nose that I have on my face, I have known from day one, Madam Commissioner, I swear to you, that you can't have contingencies, and to me contingencies are a bonus, a success fee, here's something and you're finished. The intent of this document and the drafting of this document was in compensation for continuing work and it was phrased by saying continuing representation and services to be performed. That is a condition precedent and a continuing condition to the receipt of additional compensation, which, respectfully, in the drafting of this I did not consider to be a contingency arrangement.

I would just say finally, and I mean this sincerely, hindsight, you know, in hindsight could be drafted better, no question. No question. Hindsight is wonderful for everybody. And I say that sincerely. I'm not saying that just as I'm sitting here on a witness stand under oath. I know it looks that way, but everybody that knows me knows that I have never done a contingency in my life, and I've told people you can't have it.

In addition, Bereano testified that it was not he, but his client, who wrote paragraph four:

This letter is on my stationery and I did type up and send this letter to Mr. Traina and I am not trying to walk away from it. The truth of the matter is that this language was Mr. Traina's language. I'm not making excuses, I'm not walking away from this. It's on my—I typed it and I signed it. He signed it too. But he gave me this language and I know if he were here under oath he would say that to you as well. . . .

Bereano further testified that Traina never asked him for his assistance with work from State agencies, although he acknowledged that he tried to find opportunities for Mercer in the private sector and at the county and local levels of government. He denied performing any services for Mercer that could be considered lobbying and detailed his work on

business development with private entities. He explained that he registered as Mercer's lobbyist out of an abundance of caution, as previous legal problems had convinced him always to make the fullest possible disclosure.

When confronted with his bills to Mercer for "legislative meals and expenses," after 1 November 2001, under paragraph 2 of the 1 September 2001 letter of agreement, Bereano gave several accounts of what had happened during meetings with legislators. He denied that the terms used in these bills meant he had been lobbying:

> It was related to meetings that Mr. Traina and I had with legislators that he knows that were social in nature. There was no discussion of any bills or any policies or any actions or anything of that nature. Mr. Traina from a previous job came to know a number of state legislators, so whenever we had social time periods with those legislators, that's what these charges related to.

He also stated that he had not billed Mercer for "social time," Subsequently, he elaborated:

Q. But you testified that you didn't speak to any public officials with regard to Mr. Traina—

A. On lobbying matters. They were all social. Mr. Traina has known from a previous employment a number of legislators in the Baltimore area. And on social occasions, there was no issues, no lobbying, no bills, nothing.

Q. If it is a, if it's purely a social meal or social dinner, why is it being billed? You mean to tell me you don't discuss business with these legislators?

A. No, no, there's nothing to discuss.

Q. Then why is it billed as an expense if it's not related?

A. Because Mr. Traina under our agreement is going to reimburse me for my expenses. Sometimes I would pick up not only my meal but his meal and then bill him back.

In explaining his billing practices, however, Bereano noted that personal relationships were an advantage to his clients:

[I]in lobbying you can spend a few moments talking to a public official and it's very valuable to your client. Because you've had immediate access or you have a *foundation of relationship* for that conversation, you can get a quick result or action or decision or clarification. The value of that is far greater than maybe 15 minutes of an hourly billing or something of that nature. So the clients understand that, the lobbyist understands that.

(Emphasis added).

## B.

## THE STATUTE

Bereano concedes that Maryland law has long prohibited contingency fees for lobbying. Prior to 1 November 2001, this prohibition was codified in § 5–706 of the State Government Article, which provided:

A regulated lobbyist may not be engaged for lobbying purposes for compensation that is dependent in any manner on:

(1)(i) the enactment or defeat of legislation; or

(ii)any other contingency related to legislative action; or

(2)(i)the outcome of any executive action relating to the solicitation or

securing of a procurement contract; or

(ii) any other contingency related to executive action.

Although the prohibition existed, a sanction did not. A Study Commission on Lobbyist Ethics, established in 1999, recommended the adoption of sanctions. (H.J.R. 20, Chapter 3, Acts of 1999 and S.J.R. 3, Chapter 2, Acts of 1999). In response, the General Assembly adopted the following legislation, which became effective on 1 November 2001, codified as § 15–405:

(d) If the Ethics Commission determines that a respondent has violated Subtitle 7 of this title, the Ethics Commission may:

(1) require a respondent who is a regulated lobbyist to file any additional reports or information that reasonably relates to information required under §§ 15–703 and 15–704 of this title;

(2) impose a fine not exceeding $5,000 for each violation; or

(3) subject to subsection (e) of this section, suspend the registration of a regulated lobbyist.

(e)(1) If the Ethics Commission determines it necessary to protect the public interest and the integrity of the governmental process, the Ethics Commission may issue an order to:

(i) suspend the registration of an individual regulated lobbyist if the Ethics Commission determines that the individual regulated lobbyist:

1. has knowingly and willfully violated Subtitle 7 of this title; or

2. has been convicted of a criminal offense arising from lobbying activities; or

(ii) revoke the registration of an individual regulated lobbyist if the Ethics Commission determines that, based on acts arising from lobbying activities, the individual regulated lobbyist has been convicted of bribery, theft, or other crime involving moral turpitude.

(2) If the Commission suspends the registration of an individual regulated lobbyist under paragraph (1) of this subsection, the individual regulated lobbyist may not engage in lobbying for compensation for a period, not to exceed 3 years, that the Commission determines as to that individual regulated lobbyist is necessary to satisfy the purposes of this subsection.

(3) If the Commission revokes the registration of an individual regulated lobbyist under paragraph (1) of this subsection, the individual regulated lobbyist may not engage in lobbying for compensation.

## C.

### STANDARD OF REVIEW

Our review of the Commission's fact-finding does not permit us to engage in an independent analysis of the evidence. *Anderson v. Dep't of Pub. Safety & Corr. Servs.*, 330 Md. 187, 212, 623 A.2d 198, 210 (1993). Under no circumstances may we substitute our judgment for that of the agency. *Id.* "That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency...." *Balt. Lutheran High Sch. Ass'n., Inc. v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985); *Anderson*, 330 Md. at 212, 623 A.2d at 210; *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 513, 390 A.2d 1119, 1125 (1978); *Moseman v. County Council of Prince George's County*, 99 Md.App. 258, 262, 636 A.2d 499. 501 (1994). In this context, " 'substantial evidence,' as the test for reviewing factual findings of administrative agencies, has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion....' " *Bulluck*, 283 Md. at 512, 390 A.2d at 1123 (quoting *Snowden v. Mayor of Balt.*, 224 Md. 443, 448, 168 A.2d 390, 392 (1961)). We are also obligated to view "the agency's decision in the light most favorable to the agency, since its decisions are prima facie correct and carry with them the presumption of validity." *Anderson*, 330 Md. at 213, 623 A.2d at 210; *Bulluck*, 283 Md. at 513, 390 A.2d at 1119.

## D.

### "engaged for lobbying purposes"

Bereano commences by contending that he was not subject to any sanction because he was not "engaged for lobbying purposes" on behalf of Mercer on or after 1 November 2001, the date when the legislation took effect. At the threshold, we agree with Bereano on the question of whether the sanction provision of § 15–405 may be applied retrospec-

tively. In general, statutes are presumed to operate prospectively unless a contrary intent appears. A statute will be given retrospective effect if that is the legislative intent, but not if this would impair vested rights, deny due process, or violate the prohibition against *ex post facto* laws. A statute governing procedure or remedy is applied to cases pending in court only when the statute becomes effective. *Allstate Ins. Co. v. Kim*, 376 Md. 276, 289, 829 A.2d 611, 618 (2003). In *State Ethics Commission v. Evans*, 382 Md. 370, 855 A.2d 364 (2004), we applied these principles to the statute in question in the instant case. Evans was a registered lobbyist who was convicted of wire and mail fraud in the United States District Court for the District of Maryland as a result of his lobbying activities. *Evans*, 382 Md. at 373, 855 A.2d at 365. He completed his sentence in 2000, before § 15–405 took effect. *Id.* In 2002, after that section had been in effect for several months, Evans attempted to return to lobbying and the Commission immediately attempted to sanction him under its newly granted authority. *Evans*, 382 Md. at 373, 855 A.2d at 366. We held that § 15–405 was unavailable as the basis for sanctions unless the improper conduct occurred when that statute was in effect. *Evans*, 382 Md. at 388, 855 A.2d at 374.

Bereano submits that his plight is indistinguishable from that of Evans. He classifies any improper conduct as the inclusion of a prohibited contingency clause in the agreement by which he was retained, a discrete act that occurred prior to 1 November 2001, the effective date of § 15–405. Bereano testified that he did not fulfill the agreement by lobbying on behalf of Mercer after 1 November 2001.

■ For diverse reasons, we disagree. First, under the applicable standard of review, the Commission was empowered to resolve conflicts in the evidence, based upon its conclusions concerning its determination of the credibility of the testimony and evidence presented. Faced with conflicting evidence in the form of Bereano's 13 November 2001 registration as a lobbyist on behalf of Mercer, his bills to Mercer for legislative "expenses," as well as meals, the fact that he filed

official documents showing lobbying activities after 1 November 2001, and its evaluation of Bereano's demeanor and credibility while testifying, the Commission found uncredible his claim to have done nothing other than socialize with legislators:

We find the Respondent's testimony to be less than credible and incongruous with the plain language of the documents submitted into evidence. Respondent's fee letter of September 1, 2001 to Mr. Traina recites that he was "following up our discussions." Respondent proposes to "represent Mercer Ventures in the State of Maryland" in a "lobbying" capacity relating to the company plans "to develop and obtain contracts and arrangements with various county, municipal, and State *government agencies and departments*" (emphasis added). The lobbying services would include "government matters at both the State and local levels" and Respondent would provide information to the company "as to matters of concern and importance with its work and relationship with the State of Maryland." Respondent also indicates that he "would register as a lobbyist." A reader of the September 1, 2001 letter has to go five paragraphs into the letter before the words "private contracts and businesses" appear. Respondent was being hired to obtain State contracts in Maryland and his testimony that it was not until nine months after the fee agreement that he became aware that Mr. Traina had some existing contracts with State agencies, is not credible.

Respondent testified that he did "nothing at the State level." Yet he registered as a lobbyist on November 13, 2001 for the period November 1, 2001 through October 31, 2002 (Staff Counsel Exhibit No. 1, Respondent Mercer Venture Exhibit 2). On June 12, 2002 Respondent filed an "Amended and Revised" General Lobbying Activity Report under oath and on behalf of Social Work Associates for the period November 1, 2001 through April 30, 2002. (Staff Counsel Exhibit No. 4). Respondent reported compensation and expenses related to "any and all legislative and executive matters concerning staffing and case manage-

ment, and social services issues." Included in the report is
$200 for "gifts to or for officials or employees or their
immediate families." [footnote omitted] At the hearing Re-
spondent could not explain the gift disclosure and denied
making any gifts to officials on behalf of Mercer Ventures.
During the same time period, Respondent was submitting
invoices to Mr. Traina that included statements for "legisla-
tive expenses" and "legislative expenses and meals." Re-
spondent testified that he kept detailed time records on all
his activities on behalf of his clients. Yet Respondent did
not produce records at the hearing showing his activities on
behalf of Mr. Traina and Mercer Ventures.

We will not second-guess its assessment of that evidence.
What the Court of Special Appeals observed, in another case
in the context of declaring a mistrial, is equally appropriate
here:

> [The trial court's] reviewing stand was, after all, far better
> situated than our own. He had shared firsthand the entire
> course of the trial; had observed the demeanor and reac-
> tions of witnesses, lawyers, and jurors alike; was privy to
> the vital non-verbal communication; and was in the right
> position to sense the vibrations that never surface in a
> typewritten record.

*DeLuca v. State,* 78 Md.App. 395, 435, 553 A.2d 730, 750
(1989).

█ In the case at bar, we accept all of the Commission's
first level factual findings that Bereano took actions that
constituted lobbying after 1 November 2001. We next will
review the Commission's interpretation of the law as it applies
to the facts actually found, not to the facts envisioned, espe-
cially when the Commission's decision turns on its assessment
of a party's credibility. Having done so, we must "determine
if the administrative decision is premised upon an erroneous
conclusion of law." *Aviation Admin. v. Noland,* 386 Md. 556,
573 n. 3, 873 A.2d 1145, 1155 n. 3 (2005) (quoting *United
Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230
(1994)). For the reasons that follow, we conclude that the

facts found by the Commission correctly interpreted Maryland Code (1984, 2004 Repl.Vol.), § 15–713(1) of the State Government Article and the law was not applied retrospectively.

The Commission found:

The plain language of the agreement drafted by the Respondent clearly contemplated the lobbying of various county, municipal and State government agencies and departments in Maryland, for a flat fee plus the 1% contingency fee. A fair reading of the focus of the agreement was that Respondent was going to lobby in Maryland and as a side thought, the fee agreement would also apply if Respondent was successful in other States. . . .

The facts indicate that Respondent did not file his lobbying registration on behalf of Mercer Ventures d/b/a Social Work Associates with the Commission until November 13, 2001. As such, Respondent is subject to the provisions of the law in effect as of that date, which includes the new sanctions contained in HB2. Additionally, the contingency fee restrictions contained in the Ethics Law date back to the inception of the law in 1979 and have not changed in substance since 1994. Moreover, the fee agreement at issue here was in effect until June 12, 2002 when the contingent fee provision was terminated by letter. Respondent billed Mercer Ventures pursuant to this agreement and submitted Lobbying Activity Reports in reference to this agreement, well past the November 1, 2001 effective date of HB2. As a result, Respondent's agreement and continuing relationship with Mercer Ventures is properly subject to the sanctions introduced by HB2. Accordingly, we do not believe the present complaint is a retroactive application of the law and we have authority to impose fines and suspension if appropriate. . . .

Respondent continues to lobby and is currently registered on behalf of Mercer Venture, Inc. and on behalf of the tobacco industry on matters concerning the "wholesale and retail business of tobacco"; the welfare system on matters concerning "Welfare Pilot Program, privatization issues, welfare eligibility, supplemental benefits and medical man-

agement care and child support collection programs"; and the professional liability insurance industry on matters concerning "professional malpractice insurance issues for physicians and other healthcare providers, negligence and tort law issues," among other clients.

As pointed out by the Court of Special Appeals:

According to the Commission, the fact that Bereano may not have actually secured contracts for Mercer or have been compensated pursuant to the terms of the contingency clause of the Fee Agreement was "irrelevant" because S.G. § 15–713(1) proscribes a registered lobbyist from "being engaged for lobbying purposes" for compensation that is contingent upon legislative or executive action.

174 Md.App. at 161, 920 A.2d at 1146.

And further:

Despite Bereano's explanations of the intentions of the parties, the plain language of the Fee Agreement supports the Commission's interpretation that Bereano was "engaged for lobbying purposes" on behalf of Mercer "to develop and obtain contracts and arrangements with . . . State government agencies and departments." For his success in obtaining "contract[s] and performance of services with *any* government entity, unit or agency in the State of Maryland," he was to be compensated one percent of the first year receivable in addition to the $2,000 monthly retainer. (Emphasis added.) In effect, the securing of government contracts was such an integral part of the Fee Agreement that all of the provisions of the Fee Agreement were subject to modification "except for the provision and understanding . . . to compensate [Bereano] when and after any contract is entered into [with] a government unit." Even if the percentage of the first year receivable was intended as a flat fee for continuing services, the contract still provides for compensation that is contingent upon the executive action.

174 Md.App. at 172–73, 920 A.2d at 1152–53.

Bereano argues that he simply signed the agreement but did absolutely nothing to execute it. As the Court of Special

Appeals stated, "We are persuaded that the legislative intent as expressed in the language of the statute supports an interpretation that entering into a contract for 'lobbying purposes' for compensation is an 'engage[ment]' and that the 'engage[ment]' continues for so long as the contract remains in effect." 174 Md.App. at 168, 920 A.2d at 1150.

The crucial element is not that an agreement was signed by the parties. To the contrary *it is that the agreement gave Mercer a claim upon Bereano's time and lobbying* services. There is no requirement that services actually be rendered, as the benefit to Traina begins and continues for as long as Bereano is "on call." Thus, the agreement entitled Mercer to expect that Bereano would take actions to protect and advance its interests and would refrain from taking actions that would have an undesirable effect. For example, had unfavorable legislation been introduced during the term of the agreement and had Bereano done nothing to thwart it, Mercer might have legal recourse for Bereano's failure to fulfill his lobbying obligations. In this regard, there is a kinship to a lawyer's "engagement fee" or "availability fee," in which the service purchased by the client is the attorney's availability to render service if and as needed as long as the agreement continued. *In re Gray's Run Technologies, Inc.*, 217 B.R. 48, 53 (Bkrtcy. M.D.Pa.1997).

Bereano's engagement as Mercer's lobbyist commenced, but did not terminate, on the day the agreement was signed. Despite his protestations, the Commission found that Bereano "engaged in" the lobbying activities for which he was "engaged by" Mercer, making himself available for, and engaging in, lobbying purposes after 1 November 2001, the effective date of the statute. We agree.

## II.

In his concluding assignment of error, Bereano confronts the authority of the Commission to infer that his failure to call Traina as a witness indicates that Traina's testimony would be unfavorable. The "missing witness rule," or "empty chair

doctrine," permits an "adverse inference to be drawn from a party's failure to call a material witness, when the circumstances are such that the party should naturally have called the missing witness." JOSEPH J. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 409(B), at 142 (3d ed.1999).

The implicated portion of the Commission's Final Decision and Order of concern is as follows:

> At the hearing Respondent testified that the language in the fee agreement related to "1% of the first year receivables" was added to the agreement at Mr. Traina's request and that Mr. Traina had sent him the language. The records provided at the hearing indicate that Respondent billed Mr. Traina for "Legislative expenses" and "Legislative expenses and meals." He testified that the "Legislative meals" were costs associated with his and Mr. Traina's personal meals with legislators who were personal friends and acquaintances. Mr. Traina was on the Respondent's witness list submitted to the Commission as part of the prehearing requirement pursuant to our regulations at COMAR 19A.01.03.09.A(2). Because Mr. Traina did not appear and testify, we make the inference pursuant to the "missing witness rule" that his testimony would not have supported Respondent's testimony particularly in view of Respondent's incongruous testimony.

## A.

Some background is appropriate on the rules governing administrative adjudications by the Commission to illustrate why reliance on the missing witness rule to support the agency decision in the present case is problematic. In a contested administrative hearing under the State Administrative Procedure Act (APA), each party "shall offer all of the evidence that the party wishes to have made part of the record." Maryland Code (1984, 2004 Repl.Vol.), State Govern-

ment Article, § 10–213(a)(1).[5] Similarly, if "the agency has any evidence that the agency wishes to use in adjudicating the contested case, the agency shall make the evidence part of the record." § 10–213(a)(2). It is clear that the Commission, in reaching its final decision, is limited to the facts presented on the record.[6] MD. CODE REGS. 19A.01.03.10(E)(4)(d) provides that

> [e]xcept as set forth in § E(4)(e) [taking official notice of a fact] and (f) [inadmissibility of settlement offers] of this regulation, all evidence, including records and documents in the possession of the Commission, of which the Commission desires to avail itself, shall be offered and made a part of the record in the case. Other factual information or evidence may not be considered in the determination of the case.

 There are sound policy reasons for the requirement that agencies are limited to the record in deciding a given case. In addition to satisfying constitutional due process requirements, the rule that agency decisions are limited to the record ensures that the agencies "observe the basic rules of fairness as to parties appearing before them." *Fairchild Hiller Corp. v. Supervisor of Assessments for Wash. County,* 267 Md. 519, 524, 298 A.2d 148, 150 (1973).

### B.

 The missing witness rule was misapplied here. The vital passage in American law regarding the missing witness rule comes from *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893):

---

5. Unless otherwise noted, all references to the Maryland Code in Part II of this opinion are to Maryland Code (1984, 2004 Repl.Vol.), State Government Article.

6. The Commission may take official notice of a fact not in the record, however, prior notice of its intent to do so and an opportunity to rebut must be given to all parties. § 10–213(h)(1); MD. CODE REGS. 19A.01.03.10(E)(4)(e). In the instant case, no prior notice was given to Bereano regarding the Commission's contemplation of the use of the missing witness rule and the inference it chose to draw.

> The rule ... is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.

A pivotal issue in the present case for proper application of the rule is whether Traina was "peculiarly" available to Bereano, but not to the Commission or its staff counsel. The dissent here compares the issue regarding the missing witness inference to another issue addressed in the Commission's decision.

> During the same time period, [Bereano] was submitting invoices to Mr. Traina that included statements for 'legislative expenses' and 'legislative expenses and meals.' [Bereano] testified that he kept detailed time records on all his activities on behalf of his clients. Yet [Bereano] did not produce records at the hearing showing his activities on behalf of Mr. Traina and Mercer Ventures.
>
> I see no appreciable difference between this inference and the one that followed in the next paragraph, i.e., the missing witness inference regarding Traina.

Dissent op. at 759–760.

Contrary to this view, there is an appreciable difference between the drawing of a permissible adverse inference in the two situations. As McCormick's treatise recognizes,

> the cases fall into two groups. In the first, an adverse inference may be drawn against a party for failure to produce a witness reasonably assumed to be favorably disposed to the party. In the second, the inference may be drawn against a party who has exclusive control over a material witness but fails to produce him or her, without regard to any possible favorable disposition of the witness toward the party.

2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 264 (6th ed.2006).

Documentary records regarding Bereano's activities on behalf of Mercer presumably were in Bereano's file cabinet in

his office at the time of the Commission's hearing. Bereano maintained exclusive control over those documents. Traina, however, was not under Bereano's lock and key. Prior to the evidentiary hearing before the Commission, Traina made himself available for an interview at the Commission's offices, responded to all document requests, and invited staff counsel to call him if further assistance was desired. It may not be contended reasonably that Traina was physically unavailable to staff counsel. *See United States v. Young,* 463 F.2d 934, 943 n. 15 (D.C.Cir.1972) (noting that a witness is unavailable where one party has a "better opportunity to ascertain his testimony in advance of taking the stand").

Traina was not peculiarly available to Bereano.[7] Before a missing witness inference may be drawn, it must be demonstrated that "the missing witness was peculiarly within the adversary's power to produce by showing either that the witness is physically available only to the opponent or that the witness has the type of relationship with the opposing party that pragmatically renders his testimony unavailable to the opposing party." *Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.,* 719 F.2d 1335, 1353 (7th Cir.1983). There is no contention, nor could there be, that Traina was not physically available to both parties. Therefore, the issue turns on whether Traina was demonstrated to have the type of relationship with Bereano that would render Traina unavailable to the Commission's staff counsel as a practical matter.

The dissent finds that the professional and contractual relationship between Traina and Bereano made Traina unavailable to Commission staff counsel. Such appellate fact-finding is contrary to Maryland appellate jurisprudence in deciding whether the tribunal's action under review correctly applied the missing witness rule. "A reviewing court may not make its own findings of fact or supply factual findings that were not made by the agency." *Md. Sec. Comm'r v. U.S. Sec.*

---

7. The Commission justified its use of the rule by noting that "Mr. Traina was on [Bereano's] witness list submitted to the Commission." Traina was also on the Commission's witness list.

*Corp.,* 122 Md.App. 574, 586, 716 A.2d 290, 296–97 (1998) (citations omitted). Fact-finding and argument about the propriety of applying the missing witness rule occurs in the first instance *before* the case is appealed. *See Patterson v. State,* 356 Md. 677, 688, 741 A.2d 1119, 1124 (1999) ("The missing witness inference may arise in one of two contexts. A party may request that a trial judge instruct the jury on the operation and availability of the inference where all the elements of the rule are present. Additionally, a party may wish to call the jury's attention to this inference directly during closing arguments.").

The Commission made no finding that the relationship between Bereano and Traina created a bias on the part of Traina in favor of Bereano. The nature of the relationship between the two, or the possibility of application of the missing witness inference, were not argued by anyone before the Commission. The dissent finds in a record devoid of any hostility between Traina and the staff counsel that Traina was so biased against the staff counsel that he was unavailable as a practical matter. *See* Maryland Code (1984, 2004 Repl.Vol.), State Government Article § 10–222(f)(1) ("Judicial review of disputed issues of fact shall be confined to the record...."). Yet, for a witness so slanted in favor of Bereano, Traina cooperated freely with the staff counsel's requests leading up to the hearing. Had there been any discussion of this issue on the record in front of the Commission, perhaps the dissent would be justified in upholding such a finding. As the record stands before us, however, at no point before the Commission was there anything approaching an allegation that Traina was unduly biased in favor of Bereano or that he could not be relied upon by staff counsel to give full and truthful testimony. *See United Steelworkers of Am. AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679–80, 472 A.2d 62, 69 (1984) (" 'The courts may not accept appellate counsel's post hoc rationalizations for agency action ....' " (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962))).

"What is meant by 'equal availability' in this context is not merely that a witness is subject to compulsory process, and thus available in a descriptive sense, but that he is of equal avail to both parties in the sense that he is not presumptively interested in the outcome." *Tyler v. White,* 811 F.2d 1204, 1207 (8th Cir.1987). This is a difficult showing to make. *See Hayes v. State,* 57 Md.App. 489, 499, 470 A.2d 1301, 1306 (1984) (noting the "stringent requirement that the witness be peculiarly within the control of the party"). The mere possibility that a witness personally may favor one side over the other does not make that witness peculiarly unavailable to the other side. *See Woodland v. State,* 62 Md.App. 503, 510, 490 A.2d 286, 290 (1985) ("The inference to be drawn from the failure to call a witness will arise only if the relationship between the defendant and the witness is one of interest or affection."); *United States v. Knox,* 68 F.3d 990, 1001 (7th Cir.1995) (holding that the potential for bias is not enough to make a witness practically unavailable and noting that "[e]ven government informants are not peculiarly within the government's control if the defendant can subpoena them as witnesses").

There is no suggestion in this record, much less a finding by the Commission, that Traina was "presumptively interested in the outcome." The dissent, however, would supply such a finding. *See, e.g., County Council of Prince George's County, Md. Sitting as Dist. Council v. Brandywine Enters.,* 350 Md. 339, 349, 711 A.2d 1346, 1351 (1998) ("[W]e will review an adjudicatory agency decision solely on the grounds relied upon by the agency.").

This is not to say that the social friendship and professional relationship between Traina and Bereano could not have been shown to be of such a nature that Traina would be rendered unavailable to staff counsel. The dissent, however, constructs a finding which should have been made by, if anyone, the Commission.[8] The dissent improperly presumes that the

---

8. Because there is no proper finding that the witness was unavailable to either party, the dissent presents no sound reason why the missing

friendship and professional relationship between Traina and Bereano made Traina unavailable to the staff counsel, despite case law to the contrary. *See, e.g., Bing Fa Yuen v. State,* 43 Md.App. 109, 112, 403 A.2d 819, 822–23 (1979) (finding witness equally available despite the fact that the witness refused to speak with defense counsel, was at the time of trial in a federal witness protection program, and was openly sympathetic to the prosecution); *Hayes,* 57 Md.App. at 501, 470 A.2d at 1307 (finding that the witness was equally available to both parties despite a familial relationship because "[a] witness will not necessarily testify favorably on behalf of his sister's husband"); *In re Williams,* 190 B.R. 728, 734 (D.R.I.1996) ("Citibank has failed to produce any evidence that the missing-witness attorneys were 'clearly favorably disposed' to the non-producing parties. The existence of an attorney-client relationship alone does not imply that the attorneys were clearly favorably disposed to the positions of their past or present clients." (citations omitted)); *Repecki v. Home Depot USA,* 942 F.Supp. 126, 129 (E.D.N.Y.1996) (finding that a shopping companion of the plaintiff was equally available to both parties); *D.S. Magazines, Inc. v. Warner Publisher Servs. Inc.,* 640 F.Supp. 1194, 1201 (S.D.N.Y.1986) (holding that the absence of a witness who could have been called by either party in a contract interpretation case did not justify the drawing of an adverse inference); *Harkins v. Perini,* 419 F.2d 468, 471 (6th Cir.1969) (holding that no unfavorable inference should have been permitted against the government where the government offered to submit a police officer for cross-examination at a hearing and the opposing party's attorney had declined to use the opportunity); *Jenkins v. Bierschenk,* 333 F.2d 421, 425 (8th Cir.1964) (holding that the defendant's son was equally available to both parties in the litigation); *Williams v. Morgan,* 180 So.2d 11, 14–15 (La.Ct.App.1965)

---

witness inference should not be applied against the staff counsel. Staff counsel interviewed and received all requested documents from Traina. Staff counsel knew what Traina's testimony would be if called. Had he testified, any deviation from his prior statements could have been used to impeach him.

(holding that the plaintiff's broker was equally available to both parties in the litigation).

## C.

 The dissent's reasoning, were it adopted by the Court, would lead to an unfortunate result, contrary to the established burdens in administrative actions. It is uncontested that the Commission had the burden of proving, by a preponderance of the evidence, that Bereano violated state ethics laws. MD. CODE REGS. 19A.01.03.11(A)(2). Credibility determinations are left to the finder of fact, in this case, the administrative agency. "We give great deference to the agency's assessment of the credibility of the witnesses." *Schwartz v. Md. Dep't of Natural Res.*, 385 Md. 534, 554, 870 A.2d 168, 180 (2005). The Commission was within its discretion to assign little or no credibility or weight to Bereano's testimony. What it may not do, however, is give Bereano's testimony so little credibility that it results in shifting the burden to Bereano. *See Fine v. Dep't of Transp., Bureau of Driver Licensing*, 694 A.2d 364, 368 n. 9 (Pa.Commw.Ct.1997) ("Such an inference is inappropriate where the witness could have been called by the opposing party. Moreover, a negative inference is generally made against the party with the burden of proof . . . ." (citations omitted)); *State v. Brewer*, 505 A.2d 774, 777 (Me.1985) ("The inference may have the effect of requiring the defendant to produce evidence to rebut the inference. If he fails to do so, the missing-witness inference allows the state to create 'evidence' from the defendant's failure to produce evidence. Such a result is impermissible."). That is what happened in the present case.

The Commission, within its discretion, gave little or no weight to Bereano's testimony about the language in the retainer letter concerning the "1% of the first year receivables" originating with Traina. The Commission permissibly may treat the asserted facts at issue as if Bereano had never spoken them, giving them no weight. The Commission, in not so many words, found that Bereano was incredible (or, at best, was mistaken) when he testified regarding the source o f the

language in the retainer letter. It then concluded that staff counsel satisfied its burden of persuasion on the related charge of a violation. That is not permissible under any interpretation of the rules of evidence, whether strictly or loosely applied.

The finder of fact properly may assign no weight and no credibility to a particular witness's testimony. It may not assign, however, negative weight to the testimony, inferring that the opposite of that witness's statements is true, without the consideration of any other evidence. The Commission may not infer that the relevant language in the retainer letter was inserted by Bereano simply because Bereano testified that the language came from Traina. The staff counsel does not meet its burden merely because Bereano's assertions regarding the source of the improper contract language are not considered credible. There is nothing in the record, other than the Commission's finding that Bereano was not credible, to contradict Bereano's assertion that the language in the contract originated with Traina. *See Maszczenski v. Myers,* 212 Md. 346, 355, 129 A.2d 109, 114 (1957) ("Although an inference arises from the suppression of evidence by a litigant that this evidence would be unfavorable to his cause, ... it is well settled that this inference does not amount to substantive proof ...." (citations omitted)). Even in evidence spoliation cases, the fact finder is not permitted to find the destruction of evidence to be substantive proof that the evidence was unfavorable. *See DiLeo v. Nugent,* 88 Md.App. 59, 71, 592 A.2d 1126, 1132 (1991) ("Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable, but would not in itself amount to substantive proof that the evidence was unfavorable." (citing *Miller v. Montgomery County,* 64 Md.App. 202, 214, 494 A.2d 761, 768 (1985))); *United States. v. Busic,* 587 F.2d 577, 587 (3rd Cir.1978), *reversed on other grounds,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980) ("But it is one thing to rely on [a party's] failure of proof, and quite another to argue the existence of affirmative evidence, which the [fact finder] did not hear,

inferred from the fact that a witness was not called."); *Felice v. Long Island R.R. Co.*, 426 F.2d 192, 195 n. 2 (2d Cir.1970) ("The jury should not be encouraged to base its verdict on what it speculates the absent witnesses would have testified to, in the absence of some direct evidence."); *Shaw v. Comm'r*, 252 F.2d 681, 682 (6th Cir.1958) ("The Tax Court correctly concluded that the failure of taxpayer W.A. Shaw to testify or to introduce evidence regarding any of the items in dispute was not sufficient to sustain the Commissioner's determination of fraud."); *State v. Brewer*, 505 A.2d 774, 776–77 (Me.1985) ("Since neither party vouches for any witness's credibility, the failure of a party to call a witness cannot be treated as an evidentiary fact that permits any inference as to the content of the testimony of that witness."); 2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 264 (6th ed. 2006) ("The burden of producing evidence of a fact cannot be met by relying on the [missing witness inference]. Rather, its effect is to impair the value of the opponent's evidence and to give greater credence to the positive evidence of the adversary upon any issue upon which it is shown that the missing witness might have knowledge.")

 "A missing-witness inference is not proper where there is no claim of the witness' favorable disposition towards the non-producing party." *In re Williams*, 190 B.R. 728, 733 (D.R.I.1996). There is no such claim in this record by staff counsel before the Commission. In fact, the first claim that Traina was biased against the staff counsel surfaced during judicial review of the Commission's Final Decision.

The dissent analogizes the present case to *Robinson v. State*, 315 Md. 309, 554 A.2d 395 (1989). *Robinson*, however, is distinguishable. In *Robinson*, the defendant was found driving a stolen car. *Robinson*, 315 Md. at 312, 554 A.2d at 396. He testified that he borrowed the car from "Alvin," who, in turn, told the defendant that he borrowed the car from his cousin. *Robinson*, 315 Md. at 313, 554 A.2d at 397. The defendant did not call Alvin to the stand to testify. The trial court gave a missing witness instruction requested by the

State, permitting the jury to infer that if Alvin were called to testify, he would have testified unfavorably to Robinson. *Robinson*, 315 Md. at 314, 554 A.2d at 397. We affirmed Robinson's conviction. *Id.*

*Robinson* is distinguishable in three respects. First, unlike in the present case, the defendant in *Robinson* was given an opportunity to argue or explain the absence of the witness in an effort to forestall the announced intent to rely on the missing witness rule. *Id.* The defendant argued that he lived in a neighborhood where one was subject to bodily harm for identifying a criminal perpetrator. *Id.* Moreover, he claimed that Alvin had moved since the defendant had been in contact with him last. *Robinson*, 315 Md. at 320, 554 A.2d at 400. In the present case, there was no meaningful discussion of Traina's absence until the missing witness inference was invoked in the Commission's written decision. Unlike in the present case, Alvin was not physically available to both parties in *Robinson*. Until he was on the witness stand and the trial judge signed an order charging him with contempt, the defendant in *Robinson* refused even to give Alvin's last name. *Robinson*, 315 Md. at 314, 554 A.2d at 397. The prosecution had no opportunity to confirm the existence of Alvin, much less the opportunity to interview him. In the present case, Traina voluntarily submitted documents and met with staff counsel. Finally, in *Robinson* we noted that it was common "for one found in exclusive possession of recently stolen property to fabricate a story involving another person as the provider of the property—some person often said to be known only by a street name, who supposedly gave, sold, or loaned the property to the defendant under the most innocent of circumstances." *Robinson*, 315 Md. at 317, 554 A.2d at 399. In those rather ordinary circumstances, we held that the missing witness inference was proper. Those entirely common circumstances cannot compare to the rather unique situation where an agent hired by a principal contends that prohibited contract language was originally drafted by the principal.

### D.

 The inference drawn by the Commission in its final decision is even more troubling considering the generally relaxed rules of evidence applicable in administrative hearings. "[T]he rules of evidence are generally relaxed in administrative proceedings." *Travers v. Balt. Police Dept.,* 115 Md.App. 395, 408, 693 A.2d 378, 384 (1997) (citing *Dep't of Publ. Safety & Corr. Servs. v. Cole,* 342 Md. 12, 31, 672 A.2d 1115, 1125 (1996), and *Dickinson–Tidewater, Inc. v. Supervisor of Assessments,* 273 Md. 245, 253, 329 A.2d 18, 24 (1974)); *see also* MD. CODE REGS. 19A.01.03. 10(a) ("The [Ethics Commission] hearing need not be conducted according to the technical rules of evidence, and any relevant evidence, including hearsay of probative value, is admissible."). The rules of evidence are so relaxed that the Maryland Code states that "[e]vidence may not be excluded solely on the basis that it is hearsay." § 10–213(c). In fact, an administrative agency's decision may be wholly supported by hearsay. *Md. Dep't of Human Res. v. Bo Peep Day Nursery,* 317 Md. 573, 595, 565 A.2d 1015, 1026 (1989).

Given the relaxed rules of evidence, Bereano reasonably could expect that his testimony stating what Traina would say if called to testify would be sufficient, if believed. Bereano could testify as to what Traina said the contract language meant, where the contract language originated, and what the relevant "legislative" expenses were. Although such testimony perhaps would not be admissible in a civil trial, the relaxed standards of evidence in administrative hearings permit such testimony. Because hearsay statements are admissible and may be relied upon in an administrative agency hearing, any additional evidence in support of those assertions would be cumulative.

In the instant case, the dissent would condone the Commission faulting Bereano for not calling Traina to corroborate his testimony; however, the missing witness "inference is not drawn from the failure of a party to produce cumulative and corroborative evidence." *Jacobson v. Julian,* 246 Md. 549,

557, 229 A.2d 108, 114 (1967). To paraphrase an older case, "[i]t frequently happens that a party to a suit does not deem it necessary to offer corroborative testimony, and in this case the [Commission] could have called [Traina] if it so desired." *United Rys. & Elec. Co. of Balt. City v. Cloman,* 107 Md. 681, 695, 69 A. 379, 384 (1908); *see also De Gregorio v. United States,* 7 F.2d 295, 296–97 (2d Cir.1925), *cited with approval in Critzer v. Shegogue,* 236 Md. 411, 422, 204 A.2d 180, 186 (1964) (holding that no missing witness instruction was proper where the state called only one of two law enforcement officers to testify regarding the legality of the officers' entry, noting that a contrary holding "would require a party to call all eyewitnesses at the risk of having it presumed that those not called would contradict those who were. The rule has no such purpose; it rests on the notion that the suppression of more cogent evidence than that produced is some indication that it would be unfavorable. Between witnesses having equal opportunity for observation it has never been applied.").

### E.

 The present case deviates from the typical missing witness inference in another important way. As noted above, the missing witness inference in a court proceeding takes the form either of an instruction to the jury permitting it to make such an inference, or in permitting the parties to argue the inference to the fact-finder. *See* Robert H. Stier, Jr., *Revisiting the Missing Witness Inference–Quieting the Loud Voice from the Empty Chair,* 44 MD. L. REV. 137, 166 (1985) ("Trial courts are usually called upon to determine the propriety of the missing witness inference in two situations: when an opposing counsel objects to a reference made in a closing argument about an uncalled witness, and when counsel request jury instructions on the inference."). In either case, the desired inference is noticed in advance of a final decision, and both parties are permitted to argue regarding it. *See Lowry v. State,* 363 Md. 357, 375, 768 A.2d 688, 697 (2001) (" '[T]he opposing side also has an opportunity to refute the argument and counter with reasons why the inference is inappropriate.' "

(quoting *Davis v. State*, 333 Md. 27, 52, 633 A.2d 867, 879–80 (1993))); *Thomas v. United States*, 447 A.2d 52, 58 (D.C.1982) ("Both of the factual predicates—elucidation and peculiar availability—are to be evaluated by the trial court.... Findings that each is satisfied are necessary before a party may argue in favor of a missing witness inference or the court may give an instruction authorizing the jury to draw such an inference." (citation omitted)). Because of the limited justification for the rule and the chance of an erroneous inference being drawn, "courts often require early notice from a party expecting to make a missing witness argument or intending to request such an instruction." 2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 264 (6th ed.2006); *see also Gass v. United States*, 416 F.2d 767, 775 (D.C.Cir.1969) ("[W]hen counsel, either for the prosecution or the defense, intends to argue to the jury for an inference to be derived from the absence of a witness, an advance ruling from the trial court should be sought and obtained."); *People v. Gonzalez*, 68 N.Y.2d 424, 509 N.Y.S.2d 796, 502 N.E.2d 583, 586 (1986) ("In all events, the [missing witness] issue must be raised as soon as practicable so that the court can appropriately exercise its discretion and the parties can tailor their trial strategy to avoid 'substantial possibilities of surprise.'" (quoting MCCORMICK ON EVIDENCE § 272 (3rd. ed.1984))).

The Commission's staff counsel here got to have its cake and also eat it. Staff counsel avoided any possible damage to its case through Traina's live testimony by not calling him, yet received the unsolicited benefit of the missing witness inference that his testimony would have been contrary to Bereano's testimony. *See United States v. Erb*, 543 F.2d 438, 445 (2d Cir.1976) ("But there is more than the usual aura of gamesmanship in the arguments to us on this issue. The defense had interviewed Sedgwick and presumably would have offered his testimony if it could have been helpful. For reasons of their own, defendants chose not to do so, thus avoiding any possible damaging effect from presenting Sedgwick as a witness while at the same time attempting to get the benefit of an inference from his absence."); *Burgess v. United States*, 440

F.2d 226, 239 (D.C.Cir.1970) (Robb, J. concurring) ("My inter-pretation of the record is that the witness was available to the defendant but that the defendant's counsel deliberately chose not to seek him out. Counsel carefully refrained from urging strenuously that the witness be produced; his cry for help was so muted as to be almost inaudible. I think it is a fair inference that counsel did not want the witness but hoped to take advantage of a missing witness instruction, or a claim of error if the instruction was refused. Having deliberately rejected an opportunity to produce a witness a defendant should not be permitted to complain that the witness is missing.").

The dissent's analysis runs contrary to the modern trend of reducing reliance on the missing witness rule in other legal contexts. Although many courts that recently addressed the issue, including this Court in *Patterson*, 356 Md. 677, 741 A.2d 1119, sought to reduce the scope and application of the miss-ing witness or missing evidence inference, the dissent exerts considerable effort to sustain the Commission's application of the inference in an administrative context.[9] *Patterson*, 356

---

**9.** We have cited with approval such a concern in our own jurispru-dence. In *Christensen v. State*, 274 Md. 133, 135 n. 1, 333 A.2d 45, 46 n. 1 (1975), we quoted with approval from the Supreme Court of New Jersey's opinion in *State v. Clawans*, 38 N.J. 162, 183 A.2d 77, 81–82 (1962). In *Clawans*, the New Jersey court stated:

Application of the above principles is particularly perplexing and difficult where a litigant requests a charge to that effect. Such request normally comes at the conclusion of the entire case without warning to the opposition. The allegedly defaulting party is not accorded an opportunity to justify or explain his failure to call the witness. It is conceivable that the factual situation involved in the litigation and the relationship of the parties to the witnesses, are such that the trial judge may properly reach a conclusion as to whether an inference could arise without the necessity of proof in explanation and therefore without prior warning of the intention to request a charge. The better practice, however, is for the party seeking to obtain a charge encompassing such an inference to advise the trial judge and counsel out of the presence of the jury, at the close of his opponent's case, of his intent to so request and demonstrating the names or classes of available persons not called and the reasons for the conclusion that they have superior knowledge of the facts. This would accord the party accused of nonproduction the opportunity of

Md. at 688, 741 A.2d at 1124–25 ("We now further refine the issue in the case sub judice by holding that, regardless of the evidence, a missing evidence instruction generally need not be given...."); *Herbert v. Wal–Mart Stores, Inc.*, 911 F.2d 1044, 1048 (5th Cir.1990) ("In short, there is no justification for perpetuating the uncalled-witness rule in civil cases."); *Taylor v. State*, 676 N.E.2d 1044, 1046 (Ind.1997) ("The tendered instruction, commonly referred to as a missing witness instruction, is not generally favored in Indiana."); *Schoenberg v. Comm'r*, 302 F.2d 416, 420 (8th Cir.1962) ("Any rule creating a presumption from failure to produce a witness must be applied with caution."); *State v. Hammond*, 270 S.C. 347, 242 S.E.2d 411, 416 (1978) ("We therefore hold, notwithstanding the previous rulings of this Court and the substantial authority to the contrary, that this Court will not hereafter reverse a case, civil or criminal, because of the trial judge's failure to charge the [missing witness rule]. We conclude that the charge, even in its limited and restricted uses, brings about more problems than solutions."); *Crosser v. Dep't of Pub. Safety*, 240 N.W.2d 682, 685 (Iowa 1976) ("The inference should be invoked prudently. 'Despite the plenitude of cases supporting the inference, caution in allowing it is suggested with increasing frequency.'" (quoting MCCORMICK ON EVIDENCE § 272 (2d. ed.1972))); *Commonwealth v. Groce*, 25 Mass.App.Ct. 327, 517 N.E.2d 1297 (1988) (stating that the missing witness inference "should be invited only in clear cases, and with caution"); Stier, supra, 44 MD. L. REV. at 151 ("[C]ourts have reacted to the rule's potential inaccuracy and unfairness by decreasing the number of situations in which the adverse inference might be applied, and by erecting procedural barriers for counsel to surmount before the substantive propriety of the inference will even be considered."). While many other

___

either calling the designated witness or demonstrating to the court by argument or proof the reason for the failure to call. Depending upon the particular circumstances thus disclosed, the trial court may determine that the failure to call the witness raises no inference, or an unfavorable one, and hence whether any reference in the summation or a charge is warranted.

jurisdictions are curtailing the use of the missing witness inference in civil and criminal trials, the dissent here would expand its scope in the less protected environment of an administrative hearing where the inference is relied on without warning to the charged party appearing before it.

## F.

The dissent suggests that, even if the missing witness rule and the inference drawn were mis-applied, that excludable evidence did not play a significant role in the Commission's decision. The relevant law and facts suggest otherwise. "It is well settled that an agency decision may be affirmed based only on the agency's findings and for the reasons presented by the agency." *Dep't of Econ. and Employment Dev. v. Propper,* 108 Md.App. 595, 607, 673 A.2d 713, 719 (1996) (citing *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994) and *Dep't of Econ. and Employment Dev. v. Lilley,* 106 Md.App. 744, 666 A.2d 921 (1995)). "This requirement is in recognition of the fundamental right of a party to a proceeding before an administrative agency to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings." *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772, 778 (1991). "When we review an administrative action, we may uphold the agency order only if 'it is sustainable on the agency's findings and for the reasons stated by the agency.'" [10] *Motor Vehicle Admin. v. Mohler,* 318 Md. 219, 231, 567 A.2d 929, 935 (1990)

---

10. In this respect, judicial review of an administrative action differs from judicial review of a judgment from a trial court. In reviewing a judgment of a trial court, "the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court." *United Steelworkers of Am. AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62, 69 (1984) By contrast, in reviewing an agency action, an appellate court "may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *Id.*

(quoting *Balt. Heritage v. City of Balt.*, 316 Md. 109, 113, 557 A.2d 256, 258 (1989)). "In sum, we have held that where an administrative ... agency draws impermissible or unreasonable inferences and conclusions ... or where an administrative agency's decision is based on an error of law, we owe the agency's decision no deference." *Lewis v. Dep't of Natural Res.*, 377 Md. 382, 435, 833 A.2d 563, 595 (2003), superceded by statute on other grounds as stated in *Becker v. Anne Arundel County*, 174 Md.App. 114, 920 A.2d 1118 (2007) (internal quotation omitted); *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 267, 734 A.2d 227, 232 (1999); *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 569, 709 A.2d 749, 753 (1998). "When the agency has committed an error of law, [by considering facts outside the record] the court should remand the case to the agency for further proceedings designed to remedy the error." *Eaton v. Rosewood Ctr.*, 86 Md.App. 366, 376, 586 A.2d 804, 809 (1991); *see also O'Donnell v. Bassler,* 289 Md. 501, 511, 425 A.2d 1003, 1009 (1981) ("But the guiding principle ... is that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." (quoting *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20–21, 73 S.Ct. 85, 87, 97 L.Ed. 15 (1952))). The Commission's decision in the present case was predicated in part on an improperly drawn inference flowing from an inappropriate application of the missing witness rule. That portion of the final administrative decision was unavailable as proper support for the agency's action. As it is not properly our role to determine whether the agency's decision, absent this unavailable justification, otherwise would have been the same, reversal shall be the result and a remand for further proceedings before the Commission.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AND DIRECT THE CIRCUIT COURT TO REVERSE THE ACTION OF THE STATE ETHICS COMMISSION**

AND REMAND THE CASE TO THE COMMISSION FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE DIVIDED EQUALLY BY THE PARTIES.

RODOWSKY, J., concurs.

THIEME and GETTY, JJ., dissent.

Concurring Opinion by RODOWSKY, J.

I join in the mandate of the Court and in Part I and Part II–B of its opinion.

I write separately, however, because in my view, it is unnecessary to plow new ground in applying, or limiting, the missing witness rule by assigning reasons beyond those given in Part II–B. For example, has the Court in the opinion established a new rule of procedure requiring an advance ruling by the court before counsel for a party may argue to a jury that an inference, adverse to the opponent, might be drawn from the absence of a witness? *See* Opinion at 753–754.

Also of concern to me is the apparently flat rejection in Part I–F of the opinion of the availability of the harmless error doctrine in the judicial review of agency decisions. In my opinion, it is certainly unnecessary, and perhaps unwise, to undertake to use the decision in this case as the vehicle for announcing that any error by an agency in stating the reasons for its decision requires remand. For example, if, under the statute, the Commission need only prove that Bereano entered into a contract with Mercer, so that the mere execution of the fee agreement, containing a contingency feature, conferred power on the Commission to suspend a registration, it would seem to be legally immaterial whether Traina was the initial author of the prohibited provision. Section 15–405(e)(1)(i)1, however, requires, as a condition of suspension, that the violation be committed "knowingly and willfully." Thus, in this case, I cannot say that the error is harmless. The

Commission may or may not have considered that an adverse inference from the absence of testimony from Traina was necessary to its conclusion that the violation was knowing and willful. Thus, I join in the remand in order to have that aspect of the Commission's decision clarified.

Dissenting Opinion by THIEME, J., which GETTY, J., joins.

I dissent from Part II of the Court's opinion and the judgment. I would affirm the judgment of the Court of Special Appeals.

Although what results from application of the missing witness rule is sometimes referred to as a "presumption," it is in actuality a recognition of a permissible inference. The factfinder is not required to make this inference. Nor am I aware of any action initially required to be taken to permit the application of this inference. In a jury trial, even in the absence of an instruction explaining the inference, the jury is not precluded from making it. *Yuen v. State,* 43 Md.App. 109, 113–114, 403 A.2d 819, 823 (1979).

This longstanding principle has been applied generally in civil cases of various sorts, including administrative matters. *Radin v. Supervisor of Assessments of Montgomery County,* 254 Md. 294, 301, 255 A.2d 413, 416 (1969). In 1903, this Court held that where the defendants were the only living parties to an agreement, withholding evidence which was within their power to produce resulted in the inference that the evidence, if produced, would have been unfavorable. *Turner's Executor v. Turner,* 98 Md. 22, 33, 55 A. 1023, 1027 (1903).[11] In the context of a criminal trial, we have stated:

> The failure to call a material witness raises a presumption or inference that the testimony of such person would be unfavorable to the party failing to call him, but there is no such presumption or inference where the witness is not available, or where his testimony is unimportant or cumula-

---

11. This case is also cited as *Safe Deposit and Trust Co. v. Turner.*

tive, or where he is equally available to both sides. The presumption or inference that the testimony of a missing witness would be unfavorable is applied most frequently when there is a relationship between the party and the witness, such as a family relationship, an employer-employee relationship, and, sometimes, a professional relationship.

*Christensen v. State,* 274 Md. 133, 134–35, 333 A.2d 45, 46 (1975).

Initially I note the Commission's complaint that Bereano has included in his brief arguments that were not made below, and, therefore, are unpreserved. *See* Md. Rule 8131(a). (Except for jurisdictional issues, an issue neither raised nor decided below is ordinarily waived for appellate review purposes.) Even aside from these arguments, I detect a question of preservation in this issue. It is a well recognized principle that an objection to evidence will be deemed waived if like evidence is admitted elsewhere during trial without objection. *Clark v. State,* 97 Md.App. 381, 394–95, 629 A.2d 1322, 1329 (1993); *see also S & S Bldg. Corp. v. Fidelity Storage Corp.,* 270 Md. 184, 190, 310 A.2d 778 (1973) ("any objection to its admissibility was waived by its subsequent admission without objection"); *Spriggs v. Levitt & Sons, Inc.,* 267 Md. 679, 683, 298 A.2d 442, 444 (1973) (failure to object to subsequent testimony waived earlier objection to admissibility of evidence). An analogous situation appears in the instant case. Prior to invoking the missing witness inference, the Commission referred to Bereano's inability to explain certain items billed to Mercer and said:

> During the same time period, [Bereano] was submitting invoices to Mr. Traina that included statements for "legislative expenses" and "legislative expenses and meals." [Bereano testified that he kept detailed time records on all his activities on behalf of his clients.] *Yet [Bereano] did not produce records* at the hearing showing his activities on behalf of Mr. Traina and Mercer Ventures.

(Emphasis supplied.)

I see no appreciable difference between this inference and the one that followed in the next paragraph, *i.e.*, the missing witness inference regarding Traina. In one situation, the evidence would have been documentary, while in the other, the evidence would have been testimonial. But in both situations, Bereano asked the Commission to believe there was evidence supporting his position, then did nothing to produce that evidence. The Commission was not required to take his bald assertions on faith. Because Bereano does not argue that the Commission was not entitled to draw an adverse inference from his failure to produce records, I am unable to conceive of a principled distinction between an adverse inference drawn from those records and one drawn from live testimony.[12]

Assuming *arguendo* that this issue is before the Court, I turn to Bereano's substantive arguments. First, he argues that the missing witness inference "should not" be applied at all in administrative hearings. He provides no reason for this contention, other than his belief that the application of the inference in his case was "egregious." Even if we were to accept that it was, error in the application of a rule in a particular case affects only the parties to that case and is not grounds for general revocation of that rule.

Next, Bereano argues that the inference was improperly applied because either party could have called Traina as a witness at the hearing. Traina had been interviewed prior to the hearing and there was uncontroverted evidence that he had cooperated and made himself available to investigators. However, there also was no evidence that Traina was no

---

**12.** In the instant case, there was no suggestion that Bereano had destroyed these records. Had there been evidence of such action, the inference in question would have been that of spoliation:

The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party.

longer Bereano's client or that the two no longer had a special relationship in which Bereano advised Traina about matters important to the success of his business. To the contrary, when *Maryland Pattern Jury Instructions,* MPJI–Cv 1:10 SPOLIATION (2007). asked if he had terminated his "written relationship" with Traina after the press reported allegations of impropriety, Bereano replied that Traina wrote "a letter of clarification" to which he "executed agreement." He continued to serve as Mercer's resident agent and to represent Traina and his wife in business matters.

Bereano also argues that his right to due process of law was violated because the Commission did not give him advance notice of its intention to consider Traina's absence. This argument might be more persuasive if the missing witness inference were some arcane legal principle and not a common matter in trial practice. The existence of the missing witness inference has been known to the legal community through numerous published opinions. Bereano was ably represented by counsel capable of weighing the effects of strategic decisions about which evidence should be introduced and which evidence withheld. The Commission, as fact finder, is not obligated to signal to the parties the significance or weight it is giving particular evidence so that they can adjust their strategy as trial progresses. As a deciding authority, the Commission is not required to enumerate the inferences it intends to draw from the evidence, so long as the evidence was properly admitted and the inference is a permissible one. As we said in *Robinson v. State,* 315 Md. 309, 318, 554 A.2d 395, 399 (1989):

> There is nothing mysterious about the use of inferences in the fact-finding process. Jurors routinely apply their common sense, powers of logic, and accumulated experiences in life to arrive at conclusions from demonstrated sets of facts. Even had there been no instruction concerning the availability of this inference, we think it likely that among the first questions posed in the deliberation of this case would have been, "Why didn't the defendant produce [the missing witness]?"

Why is what is permitted to a jury as fact finder not permitted to an administrative body acting in that capacity? Bereano has given us no reason and I am aware of none.

Nor has he explained why this particular inference, out of all of the inferences a factfinder is entitled to draw, should be singled out for special notice. Instead, he directs our attention to Maryland Code, State Government Article, § 15–404(b)(1), which states: "At the hearing, the staff counsel shall present to the Ethics Commission *all available evidence* relating to each alleged violation of this title;". (Emphasis added.) As explained above, I disagree that the record before us permits the conclusion that Traina was available to the staff counsel. Moreover, § 15–404(b)(1) relates to evidence and not to the inferences therefrom. Staff counsel can do no more than present evidence; inferences from that evidence must be made by the Commission as deciding authority.

Contrary to Bereano's argument, this does not shift the burden of proof. Even in a criminal case, we have upheld the application of a missing witness inference where the defendant, found in possession of a stolen car, testified that he believed the car belonged to his cousin, but he did not call his cousin as a witness. *Robinson,* 315 Md. at 313, 554 A.2d at 397. We reached this holding even while recognizing that the cousin would have had a motive to avoid self-incrimination by refusing to testify on the defendant's behalf.

Finally, I note my disagreement with Bereano's view of the emphasis placed by the Commission upon Traina's absence. Bereano contends that the Commission relied upon the inference as a substitute for fact-finding on the basic elements of the charge against him, that this reliance tainted and prejudiced all of its findings and that the inference became "the foundation" of its conclusions. My review of the Commission's decision suggests otherwise. Before even mentioning Traina's absence, the Commission reviewed the many contradictions in Bereano's testimony, comparing his account of his activities with the documents introduced into evidence. As noted above, the Commission considered the comparable absence of records

Bereano claimed to have, records which would have supported his version of the events in question. The absence of Traina was but a passing reference at the end of a lengthy discussion of Bereano's lack of credibility and not the foundation of the Commission's legal conclusions.

Judge GETTY authorizes me to state that he joins the reasoning in this dissent.